DONALD M. WALTERS, JESSIE I. WALTERS *v*. KELLAM & FOLEY, MUSSETT, NICHOLAS & STEVENSON, INC., BURTON PLUMBING-HEATING COMPANY, INC., MODINE MANUFACTURING COMPANY, GLENROY CONSTRUCTION COMPANY, INC., FINK & KRESS.

[No. 2-375A64. Filed February 17, 1977. Rehearing denied March 23, 1977. Transfer denied July 7, 1977.]

*Charles S. Gleason, Gleason, Woods & Johnson,* of Indianapolis, for appellants.

*Erle A. Kightlinger, Howard J. DeTrude, Jr., Donald Dawson, Kightlinger, Young, Gray & DeTrude,* of Indianapolis, for appellee Modine Mfg. Co., and Fink & Kress; *Hugh Watson, Locke, Reynolds, Boyd & Weisell,* of Indianapolis, for appellees Kellam & Foley and Mussett, Nicholas & Stevenson, Inc.; *John A. Young, John D. Cochran, Jr., Rocap, Rocap, Reese & Young,* of Indianapolis, for appellee Burton Plumbing-Heating Co., Inc.; *James A. O'Neal, James R. Fisher, Ice Miller Donadio & Ryan,* of Indianapolis, for appellee Glenroy Construction Co., Inc.

SULLIVAN, J.—Donald Walters, a sheetmetal worker, was injured on May 28, 1969, while he was installing certain duct work above a heating and ventilating unit in a gymnasium building. He was positioned on top of the unit and, in the course of his work, dropped a tool, which fell into the unit, coming to rest on the bottom panel. To retrieve the tool,

Walters lowered himself into the unit, placing his feet on the same bottom panel. The panel broke loose, and he fell some thirty feet to the concrete floor below. As a result, he sustained serious injuries.

Walters and his wife, Jessie (Walters)[1] filed suit for damages.

Walters appeals from a summary judgment in favor of Glenroy Construction Co., Inc. (Glenroy), the general construction contractor. Walters also appeals from judgments on the evidence in favor of the other defendant-appellees, Kellam & Foley, the architect; Mussett, Nicholas & Stevenson, Inc. (Mussett), the mechanical engineer; Burton Plumbing-Heating Co., Inc. (Burton), the mechanical contractor; Modine Manufacturing Co. (Modine), the heating and ventilating unit manufacturer; and Fink and Kress, the supplier of the Modine equipment.

Facts which are important pertain to the manner in which Walters' work was conducted. Scaffolding was available in the immediate area where he worked. However, it was used by the sheetmetal workers on this job, not as a protective device to prevent or obstruct falls, nor as a stable work location, but as a ladder to reach the top of the unit. Because the work took place at a height exceeding thirty feet, statutory provisions requiring scaffolding or staging are relevant and are hereinafter discussed. (See footnote 2, *infra*). In addition, testimony revealed that Walters and at least one other sheetmetal worker on this job had previously stepped down into the unit onto the bottom panel in the course of accomplishing their work. Whether such conduct was the customary practice in the sheetmetal trade and the admissibility of such evidence were points of controversy during trial and are at issue here.

The contractual arrangements by which the various defendants undertook the project are as follows: The Fayette

_____

1. References to "'plaintiff" hereinafter are to be taken to include both plaintiffs, Donald and Jessie Walters.

County School Corporation (Owner) and the Fayette County School Building Corporation contracted with architect, Kellam & Foley, to provide planning and architectural services for the development of a new high school complex. Kellam & Foley, in turn, subcontracted with Mussett for the engineering and design of the mechanical phases of the construction. The Owner contracted separately with Glenroy for general construction services and with Burton for mechanical construction services. Walters' employer, Brad Snodgrass, Inc. (third party defendant impleaded by Burton and severed from this litigation pursuant to a motion for separate trial), was engaged by Burton to install duct work and to assist in the installation of the Modine manufactured heating and ventilating units, supplied by Fink & Kress.

Walters and his wife brought suit alleging common law negligence against all defendants; strict tort liability against the manufacturer, Modine, and the supplier, Fink & Kress; and statutory negligence[2] against the contractors, Glenroy and Burton; the architect, Kellam & Foley, and the engineer, Mussett.

Prior to trial, the trial court granted Glenroy's motion for summary judgment pursuant to Ind. Rules of Procedure, Trial Rule 56. During the jury trial, after presentation of plaintiff's case, all remaining defendants moved for judgment on the evidence pursuant to Ind. Rules of Procedure, Trial

2. The allegation of statutory negligence is premised upon the Dangerous Occupation Act which required that in construction work of thirty (30) feet or more in height with no well-defined stories which intersect the employee work area, scaffolding or staging must be placed not more than ten (10) feet below the working employees; that such staging or scaffolding be placed and maintained to prevent falls and to prevent injuries from falling objects; that persons engaged in the construction of any building require that all appliances be carefully selected, inspected and tested to detect and exclude defects or conditions dangerous to life, limb and health, limited only by the necessity for preserving the reasonable efficiency of the object to perform the services and meet the requirements for which it was designed, but without regard to the costs related to safety precautions.

These provisions were enacted in 1911 and were cited as Ind. Ann. Stat. § 20-303 and § 20-304 (Burns Code Ed. 1956) prior to their repeal in 1971. For the present status of the law, see I.C. 22-8-1.1-1 *et seq.* (Burns Code Ed. 1971 and Burns Supp. 1976).

Rule 50, and the trial court sustained all such motions. Walters asserts that these rulings are erroneous, and, in addition, challenges the exclusion of several offers of testimony from various witnesses.[3]

We affirm the summary judgment for Glenroy and affirm the judgment on the evidence as to Kellam & Foley and as to Mussett. We reverse the judgments on the evidence as to all remaining defendants.

Our attention is directed first to the allegation that the trial court erred in granting summary judgment in favor of Glenroy, the construction contractor.

## I.

### SUMMARY JUDGMENT FOR GLENROY WAS NOT ERRONEOUSLY GRANTED

The question before us is whether there existed any genuine issue of material fact as to Glenroy.

In his complaint, Walters alleged negligence against Glenroy for failure (1) to supply or cause to be supplied a unit which would safely hold Walters' body weight; (2) to inspect and reject any faulty units, or alternatively, to warn of hidden dangers; and (3) to construct safety scaffolding, required by the Dangerous Occupation Act, *supra.*

Glenroy, in moving for summary judgment, asserted that no genuine issue of material fact existed because the school construction was done in accordance with three prime contracts: a construction contract with Glenroy; a mechanical contract with Burton; and an electrical contract with B & B Electric Company. Glenroy further asserted that each prime contractor was fully responsible for the conduct of the work to be performed under its individual contract with the Owner, and that therefore, Glenroy had no responsibility or authority with respect to the mechanical installation of the heating

---

3. Walters raises other allegations of error which because of our disposition of this case we find no reason to address.

units or any work performed relative thereto. On the other hand, plaintiff had asserted in his complaint that Glenroy, being the "general construction contractor," was the "supervising" or "general" contractor. Plaintiff later argued in his brief in opposition to the summary judgment and in his appeal brief that although Glenroy *was* one of three prime contractors, Glenroy should be held liable because it was somehow co-operating with, acquiescing in, or mutually interested in the overall construction project and therefore had a right to control the conduct of the duct work installation.

The contract between Glenroy and the Owner is not of record, nor did either party to this motion for summary judgment attempt to make it a part of the record. Consequently, the duties assigned to Glenroy by the Owner were then and are now a matter of pure conjecture. However, Walters would urge that the contract between Burton, the mechanical contractor, and the Owner permits the inference that Glenroy had on-site inspection duties as well as the responsibility for overseeing all construction work. The Burton contract, however, contains no mention of Glenroy. Its terms are largely those of the American Institute of Architect's standard form contract. The overriding emphases go to the duties of that "contractor," i.e. Burton. The only references made to "general contractor" must be construed in context with the substance and purpose of the Burton contract. In that light, the "general contractor" references undoubtedly pertain to Burton itself and are interchangeable with the use of the term "contractor" to describe Burton. This assessment is fortified by the fact that all references to "general contractor" are pre-printed in the form contract. Furthermore, we do not view that a genuine issue of fact concerning liability flowing from a duty of control or supervision may be found to exist as drawn from a contract to which Glenroy was not a party. Nor can we draw from the Burton contract, factual inferences concerning the actual circumstances on the construction site. What the Burton con-

tract evinces is that Burton, in any event, was an autonomous contractor charged with substantial responsibility and control over the mechanical work. In addition, there is nothing of record which would controvert the documentation that the contractual chain of authority for mechanical work flowed from Owner to Burton to Snodgrass, for whom Walters worked.

Trial Rule 56(E) demands:

"When a motion for summary judgment is made and supported as provided in this rule, an *adverse party* may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, *must set forth specific facts showing that there is a genuine issue for trial.* If he does not so respond, summary judgment, if appropriate, shall be entered against him." (Emphasis supplied) TR. 56(E).

Walters relied in large measure upon the allegation that Glenroy somehow asserted control or had a controlling interest by virtue of circumstances arising outside the contractual framework. Yet, he set forth no specific facts by way of affidavits, alternative documents or filings that would put into issue the otherwise undisputed fact that the worksite conduct of plaintiff's work proceeded under the authority of another self-governing prime contractor, Burton.[4]

The Burton contract established Burton as an autonomous contractor, showing no overriding authority or control in Glenroy. This contract stands alone as evidence of Glenroy's alleged control. It is insufficient as a matter of law. If the circumstances were otherwise, e.g., that Glenroy had control of the work notwithstanding the Burton contract, Walters did not attempt to show it. Accordingly, we affirm the trial court's summary judgment in favor of Glenroy. *See Letson* v. *Lowmaster* (1976), 168 Ind. App. 159, 341 N.E.2d 785.

---

4. See *Hale* v. *Peabody Coal Co.* (1976), 168 Ind. App. 336, 343 N.E.2d 316, 320, a recent similar, but not identical, case concerning construction-site negligence and statutory negligence based upon the Dangerous Occupation Act. Unlike our case, the allegedly controlling party was within the contractual chain of authority. Like this case, however, the plaintiff failed to present specific facts to show that he was under the authority and control of the defendant.

## II.

### JUDGMENTS ON THE EVIDENCE

A Trial Rule 50 judgment for a defendant is proper only if the plaintiff fails to present evidence of probative value on one or more of the elements necessary to a recovery on the claim made. *Burger* v. *National Brands, Inc.* (1976), 168 Ind. App. 289, 342 N.E.2d 870, 872; *Jordanich* v. *Gerstbauer* (1972), 153 Ind. App. 416, 287 N.E. 2d 784; *see also Elliott* v. *State* (1976), 168 Ind. App. 210, 342 N.E.2d 674, 677.

Walters charged the architect, Kellam & Foley, and the mechanical engineer, Mussett, with common law negligence in (1) failing to prepare proper plans and specifications relative to the heating units, and (2) failing to supervise installation, more specifically, failing to construct or cause to be constructed a scaffold pursuant to the Dangerous Occupation Act, failing to inspect and reject for safety reasons the Modine unit through which plaintiff fell, and failing to warn plaintiff of the hidden dangers of an adequately designed heating unit.

Walters charged Burton, the prime mechanical contractor with negligence in failing to provide adequate supervision of working conditions for compliance to safety standards by failing to inspect and reject the Modine unit or to construct scaffolding pursuant to the Dangerous Occupation Act.

Against Modine and Fink & Kress, Walters claimed common law negligence in the manufacture and supply of the unit, designating their failure to inspect the unit for its allegedly dangerous features and their failure to warn of hidden danger or defects. In addition, plaintiff sought to recover on the theory of strict tort liability.

The initial question as to all defendants is whether a duty was owed to Walters by each defendant. It is for the court to determine if a legal relationship exists from which a duty of care arises. *Miller* v. *Griesel* (1974), 261 Ind. 604, 308 N.E.2d 701; *Union Traction Co.* v.

*Berry* (1919), 188 Ind. 514, 520, 121 N.E. 655, 124 N.E. 737. If a duty exists as a matter of law, it is generally within the province of the jury to determine whether, under the precise facts of the case, the defendant's conduct measured up to the legal standard of care required by the relationship.

The Indiana Supreme Court in *Miller* v. *Griesel, supra,* clarified what questions of law the trial court is obligated to decide before a common law negligence case may be submitted to the jury:

"The first is whether the law recognizes any obligation on the part of a particular defendant to conform his conduct to a certain standard for the benefit of the plaintiff.

'The duty to exercise care for the safety of another arises as a matter of law out of some relation existing between the parties, and it is the province of the court to determine whether such a relation gives rise to such duty.' *Neal* v. *Home Builders, supra.* [(1953), 232 Ind. 160, 111 N.E.2d 280]. . . .

"The second question of law concerns what standard of care will the courts impose on this relationship once a duty is recognized. The traditional standard to be applied is whether the defendants exercised their duty with the level of care that an ordinary prudent person would under the circumstances. . . .

The third question of law for the court here is one which courts must pass upon in every civil case; that is whether the evidence introduced by the plaintiff at trial is sufficient as a matter of law to enable the jury to find that the plaintiff has established the elements of the cause of action; in this case the elements of negligence outlined above. . . ." 308 N.E.2d at 706-707.

Because the ruling and judgment are general we do not know here whether (1) the trial court felt that certain relationships spawned no duty; or (2) that certain duties arose but no probative evidence existed at the close of plaintiff's case to show conduct which did not conform to the appropriate standard of care; or (3) that certain defenses existed as a matter of law; or (4) that no probative evidence existed as to proximate cause which would enable the jury to conclude that Walters had established all elements of his cause of action.

Because of the lack of specificity in the trial court's ruling, we find ourselves on the brink of reviewing plaintiff's case, element for element, defense for defense, defendant by defendant. Also, in the process of viewing the evidence and the inference therefrom in the light most favorable to plaintiff, we tread the narrow boundary between appellate and trial court examination. We may not usurp the functions of advocate or of the jury, nor may a trial court judge do so.

There are duty, conduct, foreseeability and causation questions at the heart of this litigation which were the proper subjects of jury consideration.

### (A) JUDGMENT PROPER AS TO ARCHITECT AND MECHANICAL ENGINEER

Arguably flowing from the defendant architect and defendant engineer to plaintiff were duties of three possible types, each accompanied by a standard of reasonable care: (1) the duty to prepare plans and specifications, with the degree of competence ordinarily exercised in like circumstances by reputable members of the profession, *Paxton* v. *Alameda County* (Cal.App. 1953), 259 P.2d 934, 938; *see Worster* v. *Caylor* (1953), 231 Ind. 625, 110 N.E.2d 337, 339 (a similar standard for medical care), (2) the duty to supervise the implementation of plans and specifications, with a degree of competence ordinarily exercised in like circumstances by reputable members of the profession, and (3) the duty to supervise the conduct of work methods, with the reasonable care which would be exercised by a person of ordinary prudence under like circumstances (in view of the probable danger of injury). *Swarthout* v. *Beard* (1971), 33 Mich.App. 395, 190 N.W.2d 373, 376, *rev'd on other grds.*, 388 Mich. 637, 202 N.W.2d 300; *see Walker* v. *Wittenberg, Delony and Davidson, Inc.* (1967), 241 Ark. 525, 412 S.W.2d 621, 623, *on rehearing*, 242 Ark. 97, 412 S.W.2d 626. Whether any or all such obligations existed must be determined from the contractual terms or from the actual conduct of the architect and engineer. *See Indiana*

*State Highway Commission* v. *Thomas* (1976), 169 Ind. App. 13, 346 N.E.2d 252.

## (1)  EVIDENCE REFLECTS NO DUTY TO WALTERS BY REASON OF PLANS AND SPECIFICATIONS

With respect to the preparation of plans and specifications, Walters presented no evidence that the plans or specifications were faulty or defective so as to have resulted in Walters' injury.

Plaintiff called an architect member of the Kellam & Foley firm to testify. The following question was asked:

"Q.  Now, then, Mr. Collier, I want you to assume that an architect prepares plans, blueprints, and assume that his contract with the owner gives the architect supervision of construction, including architectural and engineering services, and assume further that the contract allows the architect the right to condemn any work that fails to conform with the document and *assume further that certain work or materials do not conform to the said documents,* do you have an opinion as to what a reasonable architect in conformity with a reasonable standard of care for architects in Indiana in 1969 would do under such circumstances?

"MR.  WATSON: [Attorney for Kellam & Foley and Mussett]. Well, I'm going to object to that, your Honor.  I don't think there's any evidence in here at this juncture that the plans and specifications for this project were improperly done or any evidence in fact that this project was completed in some way other than in accordance with the plans and specifications.  And the question assumes things which are not in evidence here." (Emphasis supplied)

Plaintiff offered this testimony apparently to show negligence on the part of the architect and engineer in allowing an alteration of the plans to relocate the heating unit filter in a vertical instead of a horizontal position, and to create the inference that if the change had not been made, the tool would not have fallen into the unit and Walters would not have had occasion to step down into it.  Notwithstanding the conflicting testimony that, in any event, the filters would not yet have been in place, if the question had elicited the reply that plain-

tiff offered to prove, i.e., "a reasonable architect in the exercise of ordinary care would condemn work that fails to conform to the documents", it would have availed him nothing. Plaintiff's question was based on the proposition "that certain work or materials do not conform to the said documents." The subsequent testimony of the consulting engineer was that the filters as installed did *conform* to an approved alteration and therefore were in compliance with the amended plans. Since the work complied with amended plans, negligence if it existed was in altering the plans. Evidence might have been proffered to show that the alteration itself represented negligent conduct on the part of the architect or engineer but we find no offer of such testimony or evidence in the record. Consequently, the trial court's judgment was correct insofar as it relates to an allegation of conduct lacking the requisite competence in preparing plans and specifications.

### (2)  EVIDENCE REFLECTS NO DUTY TO WALTERS WITH RESPECT TO ALLEGED LACK OF SUPERVISION

To appropriately define the duty to supervise, the obligation to assure that construction conforms to the authorized plans is to be distinguished from the obligation to assume responsibility for the safety of persons lawfully on the construction site. *See Walker* v. *Wittenberg, Delony & Davidson, Inc., supra* at 630; *Parks* v. *Atkinson* (1973), 19 Ariz.App. 111, 505 P.2d 279, 283; *Miller* v. *DeWitt* (1976), 37 Ill.2d 273, 226 N.E.2d 630, 638; 59 ALR2d 869; RESTATEMENT 2d, TORTS, § 414, Comments a & c; see generally *Jones* v. *Indianapolis Power & Light Co.* (1973), 158 Ind. App. 676, 304 N.E. 2d 337, 343; *Bruemmer* v. *Clark Equipment Co.* (1965), 7th Cir., 341 F.2d 23, 25; *Farmers State Bank of Valparaiso* v. *Dravo Corp.* (1963), 7th Cir., 321 F.2d 38, 41.

Plaintiff presented testimony that an architect employed by Kellam & Foley was regularly on the construction site and that Mussett provided only periodic inspection. Burton's

superintendent testified that although the architect was on the job at all times, he conferred with the Mussett representative who granted authority for mechanical changes and who appeared on the site "every week or so." A Kellam & Foley architect, who was not himself the on-site architect, testified that Kellam & Foley inspected the work under progress with respect to the entire project but not with respect to safety features of the work procedures. He also testified that Mussett made periodic observations of the work for the purpose of assuring that work progressed in accordance with the schedules which contractors had submitted. Mussett's consulting engineer testified that Mussett provided periodic supervision but was not required to provide a resident supervisor. As an example of the type of supervision provided, he surmised, "It depends on the situation, but if we find that a piece of pipe, for example, was undersize, we would bring it to the contractor's attention and say, 'Put in the right size.' " He didn't know if the Modine unit would hold a man's weight and he didn't find such a fact to be a consideration for Mussett in its development of specifications. He also testified that Mussett did not undertake supervision of the manner of installation and that therefore provisions for safety, including scaffolding, were not its responsibility; further that although the mechanical contractor was subject to Mussett control, such control extended only to approving or rejecting equipment or materials which did not conform to the plans and specifications.

This evidence is insufficient as a matter of law to show that by their on-site conduct the architect or engineer had assumed obligation for control or supervision of day-to-day construction methods and procedures. Consequently, the evidence compels the conclusion that the duty to exercise reasonable care for plaintiff's safety was not assumed by virtue of the conduct of these two defendants.

## (3)  NO DUTY TO WALTERS AROSE BY REASON OF CONTRACTUAL PROVISIONS

Next, Walters urges that these defendants, by the terms of the Owner-architect contract and the architect-engineer contract, had imposed upon them the duty to supervise the conduct of the day-to-day methods, thus the duty to exercise reasonable care for Walters' safety.

We take the contract provisions to be definitive as to the obligations assumed by the defendant architect, engineer and the various contractors.[5] While certain of the provisions could

---

5.  CONTRACT 1, BETWEEN OWNER AND ARCHITECT

"6. . . . Said contract shall provide for the Architects to prepare all working drawings and specifications subject to the approval of the Owner, and to provide all supervision of construction including architectural and engineering services. . . ."

[This agreement was excluded by trial court upon the objection made by Modine and Fink & Kress that the exhibit was not binding upon them since they were not parties to the contract. We find the document to be unobjectionable as to the parties under present consideration and to be pertinent, in the consideration with all other relevant documents, to the duties of the architects and engineers.]

CONTRACT 2, BETWEEN OWNER AND ARCHITECT

"3.4  Construction Phase-General Administration of Construction Contracts.

\* \* \*

3.4.2  To the extent provided by the contract between the Owner and the Contractor, he [the Architect] shall make decisions on all claims of the Owner and Contractor and on all other matters relating to the execution and progress of the work or the interpretation of the Contract Documents. He shall check and approve samples, schedules, shop drawings and other submissions only for conformance with the design concept of the Project and for compliance with the information given by the Contract Documents, prepare change orders and assemble written guarantees required of the contractors.

3.4.3  He will make periodic visits to the site to familiarize himself generally with the progress and quality of the work and to determine in general if the work is proceeding in accordance with the Contract Documents. He will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the work and he will not be responsible for the Contractors' failure to carry out the construction work in accordance with the Contract Documents. During such visits and on the basis of his observations while at the site, he will keep the Owner informed of the progress of the work, will endeavor to guard the Owner against defects and deficiencies in the work of Contractors and he may condemn work as failing to conform to the Contract Documents. . . ."

CONTRACT BETWEEN ARCHITECT AND ENGINEER

"(5) During Construction: The Engineer shall provide general supervision of construction for This Part of the Project to check the Contractor's work for general compliance with the Contract Documents and shall endeavor to protect the Owner against defects and deficiencies in the work of the Contractor, but he does not guarantee the Contractor's performance. The Engineer's general supervision shall not include furnishing a full time resident Engineer, but shall include the following services:

(a) Additional Instructions: The Engineer shall assist the architect in issuing such additional instructions as may be necessary to interpret the drawings and specifications or to illustrate required changes in This Part of the Project.

(b) Contractor's Submittals: The Engineer shall check shop drawings, samples, and other data submitted by the Contractor for compliance with the drawings and specifications.

\* \* \*

(d) Visits to Site: The Engineer shall make periodic inspections at the site to check the Contractor's work for general compliance with the Contract Documents and to determine the extent of work completed for checking of Contractor's requests for payment."

CONTRACT BETWEEN OWNER AND PRIME MECHANICAL CONTRACTOR

"GENERAL CONDITIONS OF THE CONTRACT FOR CONSTRUCTION:

2.2 Administration of the Contract.

\* \* \*

2.2.4 The Architect will make periodic visits to the site to familiarize himself generally with the progress and quality of the Work and to determine in general if the Work is proceeding in accordance with the Contract Documents. On the basis of his on-site observations as an architect, he will keep the Owner informed of the progress of the Work, and will endeavor to guard the Owner against defects and deficiencies in the Work of the Contractor. The Architect will not be required to make exhaustive or continuous on-site inspections to check the quality and quantity of the Work. The Architect will not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work and he will not be responsible for the Contractor's failure to carry out the Work in accordance with the Contract Documents.

\* \* \*

2.2.12 The Architect will have authority to reject Work which does not conform to the Contract Documents. Whenever, in his reasonable opinion, he considers it necessary or advisable to insure the proper implementation of the intent of the Contract Documents, he will have authority to require the Contractor to stop the Work or any portion thereof, or to require special inspection or testing of the Work as provided in Subparagraph 7.8.2 whether or not such Work be then fabricated, installed or completed. However, neither the Architect's authority to act under this Subparagraph 2.2.12, nor any decision made by him in good faith either to exercise or not to exercise such authority, shall give rise to any duty or responsibility of the Architect to the Contractor, any Subcontractor, any of their agents or employees, or any other person performing any of the Work.

\* \* \*

2.2.18 The Architect will not be responsible for the acts or omissions of the Contractor, any Sub-contractors, or any of their agents or employees, or any other persons performing any of the Work.

\* \* \*

4.2.1 The Contractor shall carefully study and compare the Agreement, Conditions of the Contract, Drawings, Specifications, Addenda and Modifications and shall at once report to the Architect any error, inconsistency or omission he may discover; but the Contractor, shall not be liable to the Owner or the Architect for any damage resulting from any such errors, inconsistencies or omissions.

\* \* \*

4.10 Responsibility For Those Performing The Work.

4.10.1 The Contractor shall be responsible to the Owner for the acts and omissions of all his employees and all Sub-contractors, their agents and employees, and all other persons performing any of the Work under a contract with the Contractor.

\* \* \*

4.18 Indemnification.

[Though not in effect at the time that this cause of action arose, a current statutory provision, IC 26-2-5-1 (Burns Supp. 1976), prohibits indemnification in most construction contracts for one's own negligence.]

4.18.1 The Contractor shall indemnify and hold harmless the Owner and the Architect and their agents and employees from and against all claims, damages, losses and expenses including attorney's fees arising out of or resulting from the performance of the Work, provided that any such claim, damage, loss or expense (a) is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself) including the loss of use resulting therefrom, and (b) is caused in whole or in part by any negligent act or omission of the Contractor, any Subcontractor, anyone directly or indirectly employed by any of them or anyone for whose acts any of them may be liable, regardless of whether or not it is caused in part by a party indemnified hereunder.

\* \* \*

4.18.3 The obligations of the Contractor under the Paragraph 4.18 shall not extend to the liability of the Architect, his agents or employees arising out of (1) the preparation or approval of maps, drawings, opinions, reports, surveys, Change Orders, designs or specifications or (2) the giving of or the failure to give directions or instructions by the Architect, his agents or employees provided such giving or failure to give is the primary cause of the injury or damage.

\* \* \*

10.1 Safety Precautions And Programs.

10.1.1. The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work.

10.2 Safety of Persons And Property.

10.2.1 The Contractor shall take all reasonable precautions for the safety of, and shall provide all reasonable protection to prevent damage, injury or loss to:

.1 all employees on the Work and all other persons who may be affected thereby.

\* \* \*

10.2.2 The contractor shall comply with all applicable laws, ordinances, rules, regulations and orders of any public authority having jurisdiction for the safety of persons or property or to protect them

be isolated so as to arguably show that the architect and engineer undertook supervision over construction, e.g., the terms of "Contract 1" between the Owner and architect, all of the provisions taken together clearly and unambiguously define a more confined responsibility for supervision. *Prest-O-Lite* v. *Skeel* (1914), 182 Ind. 593, 106 N.E. 365. The architect, assisted sometimes by the engineer, was to make decisions on claims "relating to the execution and progress of the work or the interpretation of the contract documents"; was to give necessary approval "only for conformance with the design concept of the Project"; was to "make periodic visits to the site to familiarize [itself] . . . with the progress and quality of the work and to determine in general if the work [was] proceeding in accordance with the Contract Documents." These defendants specifically declined to "guarantee the Contractor's performance" or to take responsibility for "construction means, methods, techniques, sequences or procedures, or for safety precautions," and declined responsibility for "acts or omissions of the Contractor, any Subcontractors, or any of their agents or employees." Such responsibilities as were disavowed by the architect and engineer were placed with the "Contractor", who was to be responsible for the acts, omissions and safety of "his employees and all other persons performing any of the work under a contract with the Contractor." Further, the contractor was contractually required to comply with all relevant safety laws. The indemnification clause gives additional support to the overall contractual context that the architect, and in this case the engineer, were obligated to provide plans, drawings, and specifications free from "errors, inconsistencies or omissions" and were to provide supervision to assure general conform-

---

from damage, injury or loss. He shall erect and maintain, as required by existing conditions and progress of the Work, all reasonable safeguards for safety and protection including posting danger signs and other warnings against hazards, promulgating safety regulations and notifying owners and users of adjacent utilities."
[AMERICAN INSTITUTE OF ARCHITECTS, Document A 201 (1967)].

ance with these plans, but were not obligated to provide supervision over the day-to-day work and safety procedures.

In holding that the various contract provisions do not establish, prima facie, a duty of supervision or control with respect to installation methods, we adopt the reasoning of the Louisiana Supreme Court in a similar case, *Day* v. *National United States Radiator Corp.* (1961), 241 La. 288, 128 So.2d 660, 666:

> "As we view the matter, the primary object of this provision was to impose the duty or obligation on the architects to insure to the owner that before final acceptance of the work the building would be completed in accordance with the plans and specifications; and to insure this result the architects were to make 'frequent visits to the work site' during the progress of the work. Under the contract they as architects had no duty to supervise the contractor's method of doing the work. In fact, as architects they had no power or control over the contractor's method of performing his contract, unless such power was provided for in the specifications. Their duty to the owner was to see that before final acceptance of the work the plans and specifications had been complied with, that proper materials had been used, and generally that the owner secured the building it had contracted for."

*See also Thomas* v. *Fromherz Engineers* (La.App. 1964), 159 So.2d 612.

Since we find insufficient evidence in plaintiff's case in chief to establish prima facie a relationship giving rise to a duty to supervise day-to-day work methods availing plaintiff a safe place to work, we affirm the trial court judgment as to Kellam & Foley, and Mussett. We find no legal duty founded either in contract or conduct requiring them to correct a careless or dangerous work procedure or to inspect, reject or warn of a piece of equipment dangerous only with regard to the method of its installation.

### (4) ARCHITECT AND ENGINEER NOT LIABLE BY REASON OF DANGEROUS OCCUPATION ACT

Because the Dangerous Occupation Act has been consistently construed to exculpate from liability all except those in

"charge of" or "responsible for" the work for which scaffolding is required, these defendants could be charged with negligence in violating the safety statute only if they could be found to have an obligation for the safe conduct of actual day-to-day construction by control of methods and procedures, a duty above and beyond the obligation to assure that the construction project conforms to the plans and specifications, *Prest-O-Lite Co.* v. *Skeel, supra; Leet* v. *Block* (1914), 182 Ind. 271, 106 N.E. 373; *Wyler* v. *Lilly Varnish Co.* (1969), 146 Ind. App. 91, 252 N.E. 2d 824, *rehearing denied* (1970), Ind. App., 255 N.E.2d 123.

By reason of what we have previously said concerning supervision and control, these two defendants were not subject to the liability provisions of the Dangerous Occupation Act.

Having analyzed the record and the relationship between Walters and defendants Kellam & Foley, and Mussett, from the *Miller* v. *Griesel, supra,* perspective, we determine that plaintiff's evidence wholly fails to disclose the existence of any duty owed to Walters by those two defendants. The judgments in their favor must therefore be affirmed.

### (B) JUDGMENTS ON EVIDENCE FOR REMAINING DEFENDANTS IMPROPER

We now turn to discussion of the evidentiary rulings which Walters asserts as error, for upon those rulings depends our resolution of the question concerning the judgments on the evidence in favor of the remaining defendants, Modine, Fink & Kress, and Burton.

We know that Walters was in the course of performing a work-related task and was retrieving a tool which he had dropped. We know also that the panel on which he placed his weight broke loose, causing him to fall. However, without more, the recorded evidence is insufficient to resolve whether defendants could reasonably have expected Walters to place his weight on the panel in the course of performing his task or whether plaintiff could reasonably have expected the panel

to hold his weight. Additionally, from the evidence presently of record, it is unclear why the panel broke loose. As heretofore noted these questions of duty, foreseeability, reasonable care and causation are at the heart of the litigation. They are proper questions for resolution by the jury, yet the record reflects that plaintiff's attempts to introduce evidence bearing upon these issues were thwarted by various rulings of the trial court.

### (1) EVIDENCE OF "CUSTOM",[6] "HABIT", OR "COMMON PRACTICE"

Plaintiff sought to prove through the testimony of various witnesses that it was a practice of sheetmetal workers in central Indiana to rely on panels similar to the one here involved to support their weight while doing work in and around such units. Upon objections, which were routinely sustained, the proffered evidence was excluded. Of the thirty-seven exclusions which plaintiff alleges are error, thirty-one relate to testimony which would tend to show "custom or habit."

We extract from the record the following exchanges which typify the pertinent proceedings below:

[Testimony From Plaintiff's Fellow Sheetmetal Worker On the Job]
"Q. And in doing your work did you yourself ever have occasion to stand on or be down in this plenum area and these panels on the floor of this plenum area?

*MR. KIGHTLINGER:* [Attorney for Modine and Fink & Kress] Now, if the Court please, we are back to the same situation. Whatever this man may have done is not binding upon my clients, who were not those men in control. Secondly, again it is a leading question. This gentle-

---

6. The use of the term "custom" in this case is to be distinguished from its common-law meaning. It is not here used to mean a practice which has acquired the force of law because it has enjoyed common adoption and unvarying acquiescence over a long period in a locality or throughout a wide area. We use the terms custom, habit and common practice interchangeably to denote the common practice or usage in a trade. *See* 29 Am. Jur., Evidence § 318 at 365; *see also* McCORMICK, EVIDENCE, § 195 at 462 (2d ed. 1972).

man can tell us [without] being lead [sic] and suggested [sic] as to just what he did or didn't do in the various stages of this construction.

*THE COURT:* Any comment from the other defendants?
*MR. WATSON:* [Attorney for Kellam & Foley and Mussett] Yes. I think I would object for all those reasons and for the further reason that really what this man did or didn't do as such and that's the way the question was put, is really immaterial and irrelevant because it cannot tend to show the custom and so for all those reasons we would object.

*THE COURT:* Objection sustained.

*MR. SMITH:* On all those grounds, Judge? I'll try to clear it up if it is. If not, I'll just go into the grounds of the objection.

*THE COURT:* Well, I'm inclined to agree that what this man might have done is not relevant.

*MR. SMITH:* Alright. Let me do it this way. If this man does it—this is one witness. I can only put one witness on the witness stand at a time. Another witness says the same thing. Another witness—now. See what I'm driving at? We are trying—We have to build a custom. Only one man can only account for himself. That's the only way I can do it that I know.

*THE COURT:* What's bothering me, counsel, is that I question you can establish use and custom through the employees of one employer. Now, apparently, that's what you're trying to do and I would think on that basis—

*MR. SMITH:* Well, there may be more than one employer before this case is over and that's the point. At least we know what—all this man knows is what he did.

*THE COURT:* Well, I've sustained the objection."
[Testimony on Redirect From Another Sheetmetal Worker Employed With Snodgrass During The Construction Of The School Complex]—

"Q. Now, I think you mentioned—They've asked you about what you did and so forth in getting inside the unit while it was on the ground. After it got up in the air did you get inside the unit in the plenum area?
A. I think I did, yes.
Q. And would that be on all three or four of these units?
A. I can't say for sure I got in all four of them. It's hard to remember that.

Q. Was there anything unusual about your doing that?

*MR. WATSON:* Oh, I'm going to object to that, Your Honor.

*THE COURT:* Objection sustained.

\* \* \*

Q. Well, let me try it this way, then. Why would you be inside the unit while it was in the air, inside the plenum section there?

A. To—

*MR. WATSON:* Well, Your Honor, I'm going to object to that as to why he would be inside the plenum unit. It seems to me that that's beyond the issues in this case and that the response to that question could not bring forth any probative or material evidence.

*THE COURT:* Objection sustained."

[Testimony from plaintiff]—

"Q. Now, with regard to the other units in the gymnasium there had you seen any other men working inside the plenum areas?

A. Yes.

*MR. KIGHTLINGER:* If the Court please, just a moment. In the first place it is a leading question. In the second place what other man [sic] may have done on the job which could be negligence in and of itself could not be binding upon the defendants I represent and it's wholly irrelevant and immaterial to the cause of action alleged and pursued here by the plaintiff.

*"THE COURT:* I will confine testimony on that subject, counsel, to the unit in question on the morning in question and no other time, and also, it would have to happen in the presence of this witness, and he actually saw it.

*MR. SMITH:* That's what I meant.

*THE COURT:* That's all. Not beyond that. To that extent, I'll overrule the objection.

*MR. KIGHTLINGER:* Now, just a moment, when he said that's what he meant, that isn't what he asked. He asked — he didn't say this specific unit.

*MR. SMITH:* No, that's true. I didn't.

*THE COURT:* Alright. Then I'll sustain the objection if you're talking about other units."

[Testimony from a career sheetmetal worker now with the Sheet Metal Educational Fund (supported by union members and three contractors)]

"Q.  And for how many years, over a period of years, how many years have you worked on units such as that?

A.  For twenty-three years at Sink & Edwards.

Q.  Alright. Now, then, during all your experience have you yourself and your fellow workers that worked with you worked inside these units?

*MR. KIGHTLINGER:* Now, if the Court please, I'm going to object to this question. He's now brought in fellow workers. He's mentioned Crispus Attucks High School and it's within all of our knowledge and would merely be a matter of judicial knowledge how long ago that was. And furthermore we object that he cannot establish a practice or a custom or anything else by the isolated experience of this one witness or any number of witnesses for that matter in this type of area because what they may or may not have done under a given situation could be as negligent as any one man. So, we object to it as being improper. The persistence of it is leading to the point of being prejudicial.

*MR. YOUNG:* We would join in.

*MR. WATSON:* We join in that.

*THE COURT:* The objection will be sustained

\* \* \*

"Q.  Now, Mr. Striby, it's been testified to in this case that this plenum area here is approximately thirty-nine inches high and twenty-six inches wide—this way—and approximately a hundred inches or a hundred and two inches on this dimension and consisting of a bottom or flooring being two panels each, fifty by twenty-six inches . . . it's that it was kept in place by twelve more or less equi-distant screws that consisted of four screws on one short side, four screws on the other short side and two screws on one long side and two other screws on the other long side, and— Would you have an opinion as to whether or not it would be common or usual practice in such a situation and in a unit such as that for a worker to lower himself inside the plenum unit to pick up the scratch-all?

*MR. KIGHTLINGER:* Now if the Court please, asking him about custom and practice, is wholly irrelevant and immaterial and doesn't tend to prove or disprove any issue in these two cases. His ideas of custom and practice

of sheet metal workers in the limited areas that he's already discussed are such that he can't add anything at all to this case that would be relevant.

THE COURT: Well, he asked if he had an opinion. You may answer that yes or not. Confine your answer to one of those two words.

\* \* \*

"A.   Yes, sir, I have an opinion.

Q.   Mr. Stiby, the next question is what is that opinion?

MR. KIGHTLINGER: Now, if the Court please, I am going to object on the grounds that it is not relevant to any of the issues between the plaintiff and the two defendants whom I represent, that what may be his opinion, he's not qualified as an expert and it would be the isolated situation of one witness. He has also testified something about Crispus Attucks High School and some work there and for the last three years he's been in some type of educational work and I submit that there has been no showing that he would be entitled in this type of case to give an opinion. It would be an invasion of the fact-finders in this case, or the law applicable in this case, as ultimately recorded. [Similar objections by other counsel omitted]

THE COURT: The objection will be sustained."

The obvious thrust of the objections and trial court rulings was that the phenomena of others' conduct was not relevant or material to the conduct of either the plaintiff or the defendants; further, that such testimony was inadmissible to fix the standard of conduct.

The rational and reasonable being often deports himself according to past observations and according to what he knows or has reason to believe has transpired in the past. It is not therefore necessarily unreasonable for one to indulge inferences with regard to a contemplated act. For example, as Wigmore observes, a driver who observes all vehicles ahead swerve at an apparently vacant spot in the road may indulge a natural inference that some obstruction exists at that point. WIGMORE, EVIDENCE, § 459 (3d ed. 1940).

Thus, the conduct of other persons which occurred under substantially similar conditions and the results of that prior

conduct may be relevant to the reasonableness, under the circumstances, of a particular individual's acts or omissions.

It is necessary, however, to distinguish between the use of such facts evidentially and their use to establish a standard of care which accompanies a legal duty. Here, the substantive law establishes the standard of care which must be met, i.e., reasonable care. The standard is a fixed one and is independent of the conduct of others but the conduct required of the individual to measure up to the fixed standard varies depending upon the nature of the duty owed and the surrounding circumstances. It is therefore proper to receive evidence of others' conduct, along with other evidence, from which the jury may determine that the conduct under consideration was or was not reasonable in light of all the circumstances present. WIGMORE, *supra,* §§ 495, 461; *see also* JONES, EVIDENCE §§ 4.25, 4.26 (6th ed. 1972); RESTATEMENT 2d, TORTS, § 295A.

Defendants objected that proof of a common trade practice is inadmissible because such custom or habit might itself be negligent. Justice Holmes' often cited comment in *Texas & Pacific Ry. Co.* v. *Behymer* (1903), 189 U.S. 468, 470, 23 S.Ct. 622, succinctly summarized the correct consideration on this point:

"What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not." *See also Dudley Sports Co.* v. *Schmitt* (1972), 151 Ind. App. 217, 279 N.E.2d 266, 275; RESTATEMENT 2d TORTS, § 295A at comment c; PROSSER, TORTS, § 33 at 167 (4th ed. 1971).

Case law in Indiana discloses that custom evidence is not per se inadmissible. *William Laurie Co.* v. *McCullough* (1910), 174 Ind. 477, 90 N.E. 1014, 1017, 92 N.E. 337; *Grand Trunk Western Ry. Co.* v. *Poole* (1910), 175 Ind. 567, 574, 93 N.E. 26; *Knickerbocker Ice Co.* v. *Gray* (1908), 171 Ind. 395, 404, 84 N.E. 341; *The Louisville, New Albany & Chicago Ry.*

*Co.* v. *Wright* (1888), 115 Ind. 378, 390, 16 N.E. 145, 17 N.E. 584; *see also Roberts* v. *Indiana Gas & Water Co.* (1966), 140 Ind. App. 409, 218 N.E.2d 556, 558, *on rehearing,* 140 Ind. App. 409, 221 N.E.2d 693, 695. In *William Laurie Co.* v. *McCullough, supra,* the Indiana Supreme Court developed a clear position on custom testimony. An injury was attributed to a certain floor dressing and defendant's store sought to show that the floor dressing was used in other stores in Indianapolis at and prior to the time of the accident and that no similar accidents had resulted. The evidence was excluded despite defendant's contention that the proffered testimony tended to prove that the store was not lacking in the exercise of ordinary care for the safety of its customers and that its conduct measured up to the prevailing custom and practice of similar businessmen. The Court took the position to which we adhere:

> ". . . [A]s bearing upon the question of negligence, the custom, usage, and practice, if any, with respect to the inculpated act, of other well-appointed and prudently managed concerns engaged in a similar business, are clearly competent. A class of tradesmen, for a time might suffer a negligent usage or practice to continue, and might not exercise that regard for the safety of others which would be exacted, but in the end the only standards known to the law are human, and such as men of reasonable prudence and care establish. It is apparent that the weight to be accorded to any such custom or usage must depend upon the extent or the universality of its use and its age or continuance in time, among other circumstances. Our conclusion is that in this case, and the class of cases to which it belongs, the custom or usage of using the same and similar floor dressings in other stores and public buildings was competent, but not conclusive, evidence upon the question of appellant's negligence. The offered testimony upon this subject was material, and should have been admitted for the consideration of the jury, together with other facts and circumstances given in evidence, and the court erred in excluding the same. *Knickerbocker Ice Co.* v. *Gray,* 171 Ind. 395, 404, 84 N.E. 341; (citations omitted)." 90 N.E. at 1017

Despite apparently inadvertent and seemingly inconsistent language which confuses evidence of conduct and standard of

care, we find that testimony with respect to conduct which conforms or which does not conform to an alleged custom or common practice has been accepted in the Indiana cases as relevant to the issue of negligence.[7]

Defendants successfully contested the proffered evidence below on the basis that the units with which any customary conduct could be associated must have been identical, if not the same units. Once again, Professor Wigmore's comments are persuasive:

> "The general logical requirement is, then, that when a thing's capacity or tendency to produce an effect of a given sort is to be evidenced by instances of the same effect found attending the same thing elsewhere, these other instances have probative value—i.e. are relevant to show such a tendency or capacity only if the conditions or circumstances in the other instances are similar to those in the case in hand.
>
> "But this similarity need not be precise in every detail. It need include only those circumstances or conditions which might in experience have some influence in affecting the result in question.
>
> *   *   *
>
> The similarity that is required is, in short, a similarity in essential circumstances, or, as it is usually expressed, a substantial similarity, i.e., a similarity in such circumstances or conditions as might supposedly affect the result in question." WIGMORE, *supra*, § 442 at 425.

Defendants also objected to the testimony as representing isolated instances lacking in probative value. At the onset of plaintiff's attempts to adduce custom testimony, the ques-

---

7. *See also* RESTATEMENT, 2d TORTS § 295, A Comment b: ". . . Evidence of the custom is admissible, and is relevant, as indicating a composite judgment as to the risks of the situation and the precautions required to meet them, as well as the feasibility of such precautions, the difficulty of any change in accepted methods, and the actor's opportunity to learn what is called for, and the justifiable expectation of others that he will do what is usual, as well as the justifiable expectation of the actor that others will do the same. If the actor does what others do under like circumstances, there is at least a possible inference that he is conforming to the community standard of reasonable conduct; and if he does not do what others do, there is a possible inference that he is not so conforming."

tion surfaced as to the number of instances which must be offered in order to produce a trustworthy inference of a custom.

As Wigmore has observed, the logical premise upon which custom evidence is admitted renders the number of instances immaterial. WIGMORE, *supra,* §§ 2494, 447. However, as a practical matter, the convincing quality associated with probative evidence must inhere in the proffered testimony from the context in which it is offered. One instance may suffice; conversely, several instances, though admissible, may not be sufficient to warrant a jury conclusion that a custom existed. The trial court should view the admissibility of custom testimony most liberally if any probative value can be accorded it, unless it is found to effect an unfair surprise, undue prejudice or disproportionate confusion of the issues.

Furthermore, the opposing party will always have an opportunity to challenge in the minds of the jury such evidence, not only on cross examination, but also by presentation of direct testimony of contrary, common trade practices occurring under substantially similar circumstances.

The trial court's initial determination that the custom evidence does or does not tend to prove a material proposition in the case should be made at the pre-trial conference, and a pre-trial order should direct the general course which will be followed with respect to admitting such testimony at trial. Such disposal of this evidentiary problem would have prevented the obfuscation of issues which occurred at trial in the present case.

The witnesses here were sheetmetal workers whose work experience spanned a considerable number of years with various employers, located for the most part in central Indiana. In addition, the testimony was proffered both in the form of the personal observations by each witness of similar instances and in the form of conclusions that the common practice existed. *See* 10 MOORE'S FEDERAL PRACTICE, §§ 406.01,

406.05 (1976) : *see also* 13 U.L.A., Uniform Rules of Evidence, Rule 406 at 215 (1968) ; ALI, Model Code of Evidence, Rule 307 (1942).

The proffered testimony should have been admitted for its appropriate probative value with proper instruction to the jury as to its use with respect to the fixed legal standard of conduct, i.e., that care a reasonable man under like circumstances would exercise to protect others or himself against unreasonable risk of harm.

## (2)   EXCLUSION OF EXPERT TESTIMONY

Of the thirty-seven exclusions of testimony to which plaintiff Walters objects, there are four which effectively eliminated expert testimony which would have provided evidence critical to the allegations of defective condition and/or negligent design and to the proof of causation. The following sequence best represents plaintiff's attempts.

After first qualifying his expert witness, plaintiff's attorney asked :

"Q.   Mr. Benson, assuming that on May 28, 1969, at the Connersville High School in the gymnasium thereof there was a Modine heating air returning unit, one section of which has been referred to here as a plenum or collecting plenum and which had flooring consisting of two metal panels side by side, each approximately 50 inches by 26 inches secured to angle iron superstructure, or superstructure thereof, said angle iron being two inches in one dimension and two inches in another dimension, on the other right angle dimension and approximately an eighth of an inch thickness and assuming further that attached to the angle iron was this panel 50 by 26 which was turned up on the edges all the way around one-half inch and that assuming further that this panel was secured to the angle iron by twelve self-tapping screws an inch in length and 3/16 inch in diameter or 3/16 screw, and indeed, assuming the screw or parts of screw that were presented to you for your analysis and assuming further that Mr. Walters lowered himself into and upon said paneling, with his feet in the inner dimension approximately fifteen or so inches apart, and thereafter said paneling broke loose from the

angle iron and Mr. Walters fell through, would you have an opinion as to the cause of the paneling breaking loose from the angle iron?

*MR. WATSON:* That can be answered yes or no.

*THE COURT:* You may answer yes or no.

A. Yes.

Q. And what would that opinion be?

*MR. WATSON:* Just a minute, Mr. Witness, on behalf of my defendants we will object to that question because it is in its nature a hypothetical question and therefore must comply with various rules that the law allows for it. First of all let me say that we object on the grounds that there is no showing at this point that this witness is qualified as an expert as required by law to give his opinion to a hypothetical of this kind. My position is, Your Honor, that so far it seems to me the only evidence that we have here is that Mr. Benson, while I am sure a qualified person in his field, but nevertheless is by education and main experience one of chemical engineering and physical chemistry, and the nature of this question does not call for that kind of an operation, and therefore, he is not an expert in this field. It calls for something other than a chemist. We also object because the question appears to be one of a hypothetical nature and has omitted from it many matters, in particular, the gauge of the panel material I don't think was mentioned. The position and weight of the force was not included in the question. I'm now giving counsel all the things he should put in it, but I would say that there are others that I think were not included in it, and one thing that was included in it was this fifteen inch business of feet being apart and I recollect the evidence indicating the plaintiff saying that his feet were apart, I don't recollect about fifteen inches. For all these reasons we will object to the question.

*THE COURT:* Mr. Young?

*MR. YOUNG:* We will join in.

*THE COURT:* Mr. Kightlinger?

*MR. KIGHTLINGER:* We join in.

*THE COURT:* Objection sustained.

Q. Now, let me now, then, if the Court please, amend that same question to add thereto if you would, Mr. Benson, assuming further that the gauge of the paneling was from

——was 20 to 22 to 24 gauge and assuming further that the apparent weight of Mr. Walters was about 240 pounds. Now, assuming that in addition to the assumptions I asked you to make in the previous question, would you have an opinion as to what the cause was of the paneling coming loose and falling?

*THE COURT:* Again you may answer yes or no.

A. Yes.

"Q. And what is that opinion?

Similar objections were sustained and plaintiff's counsel continued:

"Q. Alright, let's get to your qualifications then. They say you don't know what you're talking about, so we'll see, What has been your experience in metal work and metal investigations?

A. In the testing laboratory we made many investigations of the tensile strength of cast iron and steel, aluminum, of welds. We made design investigations of ladders, of chairs, tires. I've investigated a number of accidents in which the kinetics of moving objects was involved. I have investigated a number of wire rope failures in which the strength of the material and dimensions of parts were involved. I have investigated a number of gas explosions, fires, things of that nature.

Q. Now, then, with regard to——let me ask you this, have you ever been employed by Mr. Kightlinger's firm to work for him?

A. I believe I have, but I couldn't recall all of the occasions.

Q. How about Mr. Young's firm?

A. I have.

Q. Now, have you ever had occasion to do any testing on design failures of sheet metal?

A. I have with respect to ladders.

Q. And could you give us any idea of how many times or how many of those types of investigations you have involved yourself in.

A. Three or four of them.

Q. Now, how about screw failures? Have you ever been involved in any of those?

A. I have.

Q.   And how many of those have you—?

A.   One in particular.

Q.   Do you mean this one or prior to this one?

A.   Prior to this one. It involved the Northeast—or North High School.

Q.   Now, I'll ask you again, do you recall the original hypothetical question that I gave you and the matters contained therein?

A.   I think so.

Q.   And the subsequent amendment thereto, do you recall those?

A.   I do.

Q.   Now, then, I'll ask you again from those assumed facts do you have an opinion as to what caused the panel to fall?

A.   I do.

Q.   Alright, Now, what is that opinion?

\* \* \*

*MR. WATSON:* Again, the defendants I represent are going to object to this question on the grounds that there isn't a showing yet of such qualifications of the witness as to permit him by the law to render an opinion on a hypothetical question of this nature, and further for the reason that the hypothetical question simply doesn't include all the relevant parts of the evidence that is in this case hearing upon that matter, namely, well the fifteen inches apart of feet, the force and position of the man and so far as I know the gauge of the material, I'm not certain of that. For all of those reasons we would object.

*THE COURT:* I think the last question did embrace a reference to gauge that would be the only difference.

*MR. WATSON:* Yes, of some kind.

*THE COURT:* Alright, Mr. Young.

*MR. YOUNG:* I'll join in that objection.

*THE COURT:* Mr. Kightlinger?

*MR. KIGHTLINGER:* I'd like to add that the last reference referred to three gauges.

*THE COURT:* Twenty to twenty-four was the question.

*MR. KIGHTLINGER:* Twenty, twenty-four and there was one other three of them, I believe. And I'm going to object on the basis of that because there is no evidence in this record of any three gauges involved here.

*THE COURT:* Alright. The objection will be sustained."

No doubt, a question could have been framed so as to be less susceptible to objection. We observe that defendants contested the qualifications of Benson with regard to the particular area of expertise his education and experience represent. Such specificity is generally not warranted and does not seem to us to be warranted, given the practical experience and similar testing which the witness has done. *See* McCORMICK, EVIDENCE § 13 (2d ed. 1972). Defendants did not specify in making their objections why Benson's area of expertise or experience would make him an incompetent expert witness; moreover, we view such attacks to be the proper subject of cross-examination bearing upon the weight to be given the direct testimony.

. Plaintiff Walters proffered the testimony to show that by spreading his feet, purportedly to prevent unsightly rippling of the panel, he distributed his weight in such a way that the screws could not withstand the resultant tension, and therefore, the panel broke loose causing him to fall. He asserts that Benson's testimony would have revealed the gauge of the metal and the quality of the screws were not so much the cause of failure as the number and placement of the screws. Benson's calculations would have suggested, therefore, that an alternative design was feasible and would have prevented the panel failure and also that a design failure was the proximate cause of plaintiff's injury. We are quick to note that such conclusions would be capable of rebuttal on cross-examination and by direct evidence which defendants might choose to produce.

Defendants further objected to the factual content upon which the hypothetical question to Benson was based. They made particular reference to counsel's failure to include the specific gauge of the metal panel and also to his inclusion of "15 inches" (the spread of plaintiff's feet), since earlier testimony was simply that he spread his feet. Long intricate hypothetical questions lending themselves to such exacting objections and to the "battle of the experts" frustrated trial

procedures below and are of a type which have come into disfavor. *Rabata* v. *Dohner* (1969), 45 Wis.2d 111, 172 N.W. 2d 409; McCORMICK, *supra*, §§ 16, 17; WIGMORE, *supra*, § 563.

Our review of the Indiana cases in which similar evidentiary sequences have been the subject of appeal discloses that generally such testimony has been admitted over objection. Consequently, on appeal, such testimony has been found properly admissible, largely because such determinations lie within the sound discretion of the trial court. E.g., *Kampo Transit, Inc.* v. *Powers* (1955), 138 Ind. App. 141, 211 N.E.2d 781, 791.

A hypothetical question need not contain all the facts in evidence. It must, however, contain sufficient facts and inferences to present a true and fair relationship to the whole evidence in the case. It must not be so worded or exaggerated as to mislead or confuse the jury; and it must not be so lacking in essential facts as to be without value to the decision. *Ailes* v. *Ailes* (1937), 104 Ind. App. 302, 11 N.E.2d 73, 74; *Chicago, Indianapolis & Louisville R.R. Inc.* v. *Freeman* (1970), 152 Ind. App. 492, 284 N.E.2d 133, 136. *See* 32 CJS, Evidence § 551 (2).

We find the expert testimony proffered by plaintiff to fall within such parameters, and we find Indiana's position to be fair and to produce unbiased results in accordance with the more enlightened management of hypothetical questions:

"The type of hypothetical questions just discussed, namely those based on other testimony in the case, satisfy the requirement imposed upon all hypothetical questions, that the facts assumed must be supported by evidence in the case. This requirement is based on the notion that if the answer is founded on premises of fact which the jury, for want of evidence, cannot find to be true, then they are equally disabled from using the answer as the basis for a finding. Direct testimony supporting the fact assumed is not required. It is sufficient if it is fairly inferable from circumstances proved. Moreover, the supporting evidence need not have been already adduced if the interrogating counsel gives assurance that it will be. And of course, it is no ob-

jection that the supporting evidence is controverted. The proponent is entitled to put his side of the case to the witness for his opinion.

"There is a possible danger, however, that by omitting some of the facts, the proponent may present an unfair and inadequate picture to the expert, and that the jury may give undue weight to the answer, without considering its faulty basis. What safeguards should be supplied? Some courts have required that all facts material to the question should be embraced in the hypothesis, but this viewpoint seems undesirable because it is likely to multiply disputes as to the sufficiency of the hypothesis, and may tend to cause counsel, out of abundance of caution, to propound questions so lengthy as to be wearisome and almost meaningless to the jury. The more expedient and more widely prevailing view is that there is no rule requiring that all material facts be included. *The safeguards are that the adversary may on cross-examination supply omitted facts and ask the expert if his opinion would be modified by them,* and further that the trial judge if he deems the original question unfair may in his discretion require that the hypothesis be reframed to supply an adequate basis for a helpful answer." (Emphasis supplied.) McCORMICK, *supra,* § 14 at 33; *see also Ailes* v. *Ailes, supra,* at 74; *Taylor* v. *Taylor* (1910), 174 Ind. 670, 678, 93 N.E. 9; *Chicago, Indianapolis & Louisville RR. Inc.* v. *Freeman, supra,* at 136; *Lockmondy* v. *Jester* (1976), 168 Ind. App. 563, 343 N.E.2d 793, 796; *Ramsey* v. *Complete Auto Transit, Inc.* (1968), 7th Cir., 393 F.2d 41, 44.

In the light of our determinations that the trial court erred in excluding the testimony which we have designated as "custom" evidence and in excluding certain expert testimony it is impossible to conclude that the court's TR. 50 judgments are nonetheless valid. It would require sheer speculation to say that had the excluded evidence been received together with such supportive exhibits or supplemental testimony as that excluded evidence might generate, the trial court would have nonetheless granted judgment on the evidence. That excluded evidence and its unknown effect upon the totality of evidence already of record or adducable thereafter bears arguably upon myriad issues in the litigation, i.e., actual and constructive knowledge on the part of various defendants,

contributory negligence, assumption of or incurred risk, design defect, duty to inspect, etc., etc. The posture of the case as to one or more defendants and as to one or more issues could be dramatically changed by that excluded evidence and its permissible effects.

Because we review the record in a light most favorable to a plaintiff where a judgment on the evidence has truncated his opportunity to litigate legitimate issues, and because we find that crucial evidence in this case has been excluded on faulty grounds, we are compelled to reverse and remand the cause as to Modine, Fink & Kress, and Burton for further proceedings consistent with this opinion. In so doing, we are mindful of the expenditure of time, and money, and the resultant frustration to all the parties. We remind the bar that the complications which spurred this appeal are precisely those which give impetus to the pre-trial procedures provided in Indiana Rules of Procedure, Trial Rule 16.

Judgment affirmed as to Glenroy, Mussett, and Kellam & Foley. Judgment reversed as to Modine, Fink & Kress, and Burton.

Buchanan, P.J., concurs; White, J., concurs in result.

NOTE.—Reported at 360 N.E.2d 199.