

FILED

Feb 09 2018, 10:02 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT
WALSH CONSTRUCTION
COMPANY II, LLC

Brandon J. Kroft
Heather T. Gilbert
Cassiday Schade LLP
Crown Point, Indiana

ATTORNEYS FOR APPELLANT
JENNIFER A. SMITH

Jacob M. O'Brien
Andrew B. Miller
Starr Austen & Miller, LLP
Logansport, Indiana

ATTORNEYS FOR APPELLEE
CASE FOUNDATION COMPANY

Christina L. Fugate
Derek R. Molter
Gregory W. Pottorff
Ice Miller LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE
IRVING MATERIALS, INC.

Bruce P. Clark
Bruce P. Clark & Associates
Saint John, Indiana

ATTORNEYS FOR APPELLEE
ROUDEBUSH GRADING, INC.

Richard A. Rocap
Matthew K. Phillips
Rocap Law Firm LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
ROADSAFE HOLDINGS, INC.

T. Allon Renfro
Bryan E. Rogers
Swanson, Martin & Bell, LLP
Chicago, Illinois

ATTORNEY FOR APPELLEE
BERNARDIN LOCHMUELLER AND
ASSOCIATES, INC., N/K/A
LOCHMUELLER GROUP, INC.

Robert D. Emmerson
Defur Voran, LLP
Fishers, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jennifer A. Smith, as Personal
Representative of the Estate of
Joshua J. Smith, Deceased,

*Appellant/Appellee-Plaintiff,*

v.

Walsh Construction
Company II, LLC,

*Appellant-Defendant,* and

Case Foundation Company,
Irving Materials, Inc., Bernardin
Lochmueller and Associates,
Inc. n/k/a Lochmueller Group,
Inc., RoadSafe Holdings, Inc.,
Roudebush Grading, Inc.,

*Appellees-Defendants*

February 9, 2018

Court of Appeals Case No.
08A02-1706-CT-1493

Appeal from the Carroll Circuit
Court

The Honorable Benjamin A.
Diener, Judge

Trial Court Cause No.
08C01-1402-CT-2

**Baker, Judge.**

In February 2013, Joshua Smith died as a result of a car accident that occurred on a stretch of Old State Road 25 near a bridge construction project. Smith's estate (the Estate) filed a wrongful death claim against a number of entities, including Walsh Construction Company II, LLC (Walsh), Case Foundation Company (Case), Irving Materials, Inc. (IMI), Bernardin Lochmueller and Associates, Inc. n/k/a Lochmueller Group (Lochmueller), RoadSafe Holdings, Inc. (RoadSafe), and Roudebush Grading, Inc. (Roudebush). The defendants each filed separate summary judgment motions. The trial court granted summary judgment in favor of all defendants except for Walsh. The Estate now appeals the orders granting summary judgment in favor of Case, IMI, RoadSafe, and Roudebush; Walsh now appeals the order denying its motion for summary judgment and the orders granting summary judgment in favor of all the other defendants.

We find that there are genuine issues of material fact preventing summary judgment in favor of all defendants except for RoadSafe. Therefore, we affirm the denial of Walsh's summary judgment motion, affirm the grant of RoadSafe's summary judgment motion, and reverse the grant of summary judgment in favor of Lochmueller, IMI, Case, and Roudebush. We remand for further proceedings.

# Facts

## *The Construction Project and the Parties*

[3] In the summer of 2004, the Indiana Department of Transportation (INDOT) began the process of undertaking the Hoosier Heartland Highway construction project (the Project). The purpose of the Project was to replace Old State Road 25 (SR-25) with a four-lane, limited access highway from Lafayette to Logansport.

[4] INDOT contracted with Lochmueller to design Section 2D of the Project. Lochmueller included all INDOT mandated erosion control measures and maintenance of traffic plans in its design. Lochmueller's design, including the erosion control plan, was reviewed and approved by Walsh, INDOT, and the Indiana Department of Environmental Management (IDEM). Near the site of the accident, there was a roadside ditch running along the north side of a super-elevated curve. The Lochmueller designer ultimately determined that silt fencing was not required in that area because the roadside ditch was there to catch runoff surface water from adjacent fields and drain it away from the roadway pavement.

[5] On February 8, 2012, INDOT opened the Project for bidding. Walsh was ultimately awarded the bid to serve as General Contractor on the Project. Walsh, in turn, entered into subcontract agreements with Roudebush, RoadSafe, Case, and IMI. According to Walsh, all subcontractors were required to keep SR-25 free from mud caused by their work and to notify Walsh

of any unsafe condition they observed. Walsh also inspected the roadway daily for mud and would clean the roadway if necessary.

[6]  Roudebush was responsible for the installation and maintenance of erosion control measures. To that end, it installed a temporary silt fence, temporary fiber roll, erosion control blanket with permanent seed and fertilizer, temporary ditch inlet protection, seeding, and straw mulching. As Lochmueller had determined that no silt fencing was needed along the outside of the curve near the location of the accident, Roudebush did not install one. Walsh and INDOT confirmed that all erosion control measures complied with Lochmueller's plans. The last date that Roudebush was on site was January 21, 2013, two weeks before the accident.

[7]  RoadSafe was responsible for the installation and maintenance of all construction road signage pursuant to Lochmueller's design plans. INDOT, Parsons Brinckerhoff (the Project engineer and INDOT's day-to-day representative at the site), and Walsh determined where needed signs would be placed, and RoadSafe followed their directives. The maintenance of traffic plan in the construction design called for a reduction in speed from 55 miles per hour to 45 miles per hour in both directions leading up to the accident site; it is undisputed that this speed limit reduction was not in place at the time of the accident. Evidently, INDOT and/or Parsons Brinckerhoff had determined that no reduction was necessary and did not direct RoadSafe to put such a sign in

place until August 2013.[1] Lochmueller's maintenance of traffic plan did not call for signage warning of mud on the roadway or of construction entrances, and no such signs were recommended or placed by RoadSafe. At the time of the accident, all RoadSafe signage complied with the directives it had received. No RoadSafe employees were on-site on the day of the accident.

[8]     Case was responsible for installing drilled concrete shafts for a bridge to be constructed over the Robinson Branch (a small stream). The Robinson Branch site was located on a sweeping curve in the roadway where the road pitched downward from the higher-elevated north side of the roadway to the lower-elevated south side. The bridge work took place on the north side of the road; Case employees accessing this site parked their vehicles in a temporary parking lot just off SR-25 and walked to the construction site. The construction entrance into this parking lot led to a "haul road," which was used to move the equipment needed to work on the bridges.[2] Case was performing work in this area in the days leading up to the accident and on the day of the accident.

[9]     IMI entered into a purchase order agreement with Walsh to supply concrete for the Project, including in the pre-drilled shafts being installed by Case. The agreement incorporates the requirements of INDOT and the Project drawings,

[1] The rationale for this decision was that until August 2013, all construction was taking place off of SR-25 rather than on that roadway. Only in August 2013 would the configuration change such that the construction would move to SR-25 itself.

[2] Walsh had determined the location for and built the construction entrance, parking area, and haul roads at the Robinson Branch site.

both of which require immediate removal of dirt from public roadways, though IMI claims it had no such obligation. IMI Br. p. 11. The day before the accident, IMI made nine deliveries of concrete to Case near the accident location, but no IMI employees were present on the day of the accident. IMI would have used one of the constructions entrances, including either the cross-over entrance or the parking lot/haul road entrance.

### *The Accident*

[10] On February 7, 2013, Walsh employee Matt Kulp inspected SR-25 and cleaned mud from the road before leaving the worksite at 5:30 p.m. Kulp testified that when he left the worksite, there was no mud on the road. Case employee Rob Jones testified that he was the last person to leave the construction area around 7:30 p.m. and that there was no mud on the road at that time.

[11] That evening, Joshua Smith was driving from his home in Logansport to work in Delphi. At approximately 9:20 p.m., he was driving westbound on SR-25 near the temporary construction entrance at the Robinson Branch worksite. As he drove on this stretch of road, Smith allegedly encountered a substantial amount of mud and washout that had accumulated on the surface of the roadway. He lost control of the vehicle, which drifted left of the center line and collided head-on with an eastbound pickup truck being driven by Amanda West. Smith died shortly thereafter. At the time of the accident, it was lightly raining.

[12]     Investigative records of law enforcement, witness testimony, and photographs taken the night of and the morning after the accident revealed mud, gravel, and sediment covering SR-25 in the vicinity of the accident. The mud obscured the center and northern fog lines of the road. Witnesses at the scene identified two sources of the mud in the road: washout from the construction worksite and tracking left in the roadway by vehicles exiting the worksite via the temporary construction entrance. The lead investigating officer, Darren Giancola, determined that, whatever its source, mud in the roadway caused or contributed to cause Smith's vehicle to cross the center line and collide with West's vehicle. Although the responding officers noticed the mud in the roadway, they did not clean the road before reopening it to traffic because they did not believe that it constituted a safety hazard.

[13]     John West, who was Amanda West's passenger, and Ralph Anderson, a semi-truck driver who drove past the accident, stopped, and called the police, testified that they did not recall seeing any mud in the roadway.

[14]     People who frequently drove by the construction site on SR-25 testified that the area was never kept clear of mud and that tracked mud and debris from construction traffic was a regular problem at the accident site. A Walsh employee testified that there was "absolutely" a problem with mud and sediment accumulating on SR-25 adjacent to the worksite, adding that such accumulations were so common that no effort was made to document the condition each time it manifested. Estate App. Vol. IV p. 47.

On February 13, 2014, the Estate filed a wrongful death complaint against West[3] and Walsh. The Estate filed a second amended complaint on January 16, 2015, naming Walsh, IMI, Case, Roudebush, RoadSafe, and Lochmueller as defendants.[4]

On January 31, 2017, each of the defendants filed a motion for summary judgment. The Estate opposed each of the motions; Walsh opposed the motions of its co-defendants except for Lochmueller. Following voluminous briefing and oral argument, on May 29, 2017, the trial court issued orders granting summary judgment in favor of IMI, Case, Roudebush, RoadSafe, and Lochmueller. Each of those orders has been certified for interlocutory appeal (except for the order related to RoadSafe, which was entered as a final appealable order). That same day, the trial court summarily denied Walsh's motion for summary judgment. That order has also been certified for interlocutory appeal.

Walsh appeals the orders granting summary judgment in favor of its co-defendants and the order denying summary judgment in its favor; and the

---

[3] The Estate voluntarily dismissed West from the complaint on December 31, 2014.

[4] The Estate also included other named defendants, but they are not relevant to this appeal.

Estate appeals the orders granting summary judgment in favor of IMI, Case, Roudebush, and RoadSafe.[5]

# Discussion and Decision[6]

## I. Standard of Review and Generally Applicable Law

Our standard of review on summary judgment is well established:

> We review summary judgment de novo, applying the same standard as the trial court: "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Williams v. Tharp,* 914 N.E.2d 756, 761 (Ind. 2009) (quoting T.R. 56(C)). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Id.* (internal citations omitted).

*Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014).

---

[5] Initially, two separate appellate causes were created when the multiple orders were appealed. Those two causes have now been consolidated into this one—Cause Number 08A02-1706-CT-1493.

[6] The Court thanks counsel for all parties for very well-written, thoughtful, respectful briefs. In a case as complicated as this one, with so many moving parts, it significantly helps this Court to have everything laid out in such logical and organized fashion.

[19]   The Estate's wrongful death claims sound in negligence.  Estate Appellant's App. Vol. II p. 10-33. [7]  To prevail on a negligence claim, the plaintiff must show (1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty by allowing conduct to fall below the applicable standard of care; and (3) compensable injury proximately caused by the breach of duty.  *E.g.*, *Kroger Co. v. Plonski*, 930 N.E.2d 1, 6 (Ind. 2010).  The element of duty is generally a question of law to be determined by the court.  *Bloemker v. Detroit Diesel Corp.*, 720 N.E.2d 753, 757 (Ind. Ct. App. 1999).  The elements of breach and proximate cause, however, generally present questions of fact that must be determined by a factfinder.  *E.g.*, *Megenity v. Dunn*, 68 N.E.3d 1080, 1083 (Ind. 2017); *Hamilton v. Ashton*, 846 N.E.2d 309, 316 (Ind. Ct. App. 2006).

# II.  Walsh

[20]   Walsh argues that the trial court erroneously denied its motion for summary judgment.  The complaint alleges that Walsh was negligent in one or more of the following ways:

- negligently maintaining the roadway near SR-25 by leaving it mud-covered;
- allowing construction traffic to deposit dirt, mud, fill, etc., onto the surface of the roadway when exiting the construction area;
- leaving excess fill on the shoulders next to the roadway such that it could have been washed onto the pavement;

---

[7] The Estate filed appendices as both appellant and appellee.

- failing to use a silt fence or other barrier to prevent dirt, mud, fill, etc., from washing onto the roadway;
- failing to properly reduce the speed limit in and near the construction zone; and
- failing to provide or maintain warning signs or other guidance systems regarding the mud for motorists.

Estate Appellant's App. Vol. II p. 14-15.

# A.  Duty

[21]  Walsh contends that, as a matter of law, it owed no duty to Smith.  Duty is generally a question of law that may be decided on summary judgment.  *E.g.*, *Peters v. Forester*, 804 N.E.2d 736, 738 (Ind. 2004).

[22]  A general contractor is not liable for the negligence of a subcontractor unless the subcontractor is performing a non-delegable duty.  *The Hunt Constr. Grp. v. Garrett*, 938 N.E.2d 794, 798, *aff'd*, 964 N.E.2d 222 (Ind. 2012).  There are five categories of non-delegable duties, one of which is relevant in the instant case: where the principal is, by law or contract, charged with performing the specific duty.  *Id.* at 789.  In analyzing this duty, we examine whether the general contractor's contract "'affirmatively evinces'" an intent to assume a duty of care to the plaintiff in relation to the hazards at issue.  *Gwinn v. Harry J. Kloeppel & Assocs., Inc.*, 9 N.E.3d 687, 692 (Ind. Ct. App. 2014) (quoting *Shawnee Constr. and Eng'g, Inc. v. Stanley*, 962 N.E.2d 76, 82 (Ind. Ct. App. 2011)).

[23]  In *Gwinn*, the plaintiff filed a negligence claim against a general contractor for a school renovation project, seeking to recover for injuries sustained when a

negligently installed projection screen fell and struck the plaintiff, who was an employee of the school. *Id.* at 688. The general contractor did not, itself, install the projection screen; instead, it had hired a subcontractor to perform that work. The trial court granted summary judgment in favor of the general contractor, and this Court reversed, finding that its contract with the subcontractor "affirmatively evince[d]" an intent to charge the general contractor with a specific duty of care. *Id.* at 693-94. Specifically, the general contractor "assumed a duty to supervise the work of its subcontractors and the construction methods employed in a reasonably prudent manner and specifically assumed responsibility for the alleged negligent acts and omissions of its contractors." *Id.* at 694. That duty of care was owed to the school and its employees, including the plaintiff.

[24] In this case, Walsh's contract with INDOT required Walsh to "take all reasonably necessary actions to protect . . . the safety of the public . . . ." Estate Appellee's App. Vol. II p. 148. Additionally, while Walsh was permitted to hire subcontractors, Walsh itself was required to perform 30% of the work. *Id.* at 34.[8] Walsh was also required to provide a stable construction entrance at the points where construction traffic would enter the roadway; that entrance was required to be constructed of twelve inches of stone. *Id.* at 138. Part of its

---

[8] The contract notes that "[t]he words 'by the Contractor' will not necessarily be used to so indicate," meaning that when that phrase is used, it could indicate that a subcontractor, rather than Walsh, bore that contractual obligation. *Id.* at 149. Consequently, we will not rely on any contractual provisions containing the phrase "by the Contractor" in determining whether Walsh bore a non-delegable duty of care.

duties included addressing any and all degradation and erosion control issues occurring at the construction entrances and haul roads. The contract required that "the roadway, structures, barricades, and construction signs [be] kept in satisfactory condition at all times." *Id.* at 151. Finally, the contract required that provision be made "for prompt removal from traveled roadways of all dirt and other materials that have been deposited thereon by operations concerned with the project whenever the accumulation is sufficient to cause the formation of . . . mud . . . or create a traffic hazard." *Id.* at 152. We find that all these provisions—especially the one requiring Walsh to protect the safety of the public—affirmatively evince an intent to charge Walsh with a general, non-delegable duty of care.

[25] Even if there was no non-delegable duty of care, however, it is apparent that Walsh did not, in fact, actually delegate all of its obligations. By its own admissions, Walsh retained (among others) the following obligations:

- To perform daily inspections, ensuring that mud or debris did not obstruct the roadway or pose a traffic hazard, Estate Appellee's App. Vol. II p. 15, 67-69, Vol. III p. 48-50;
- To keep the roadway clean, including cleaning the roadway itself when necessary, *id.* at Vol. II p. 12-13, 76-79, 81, 88-92, 96-97;
- To ensure that all subcontractors were keeping the roadway clear of mud, dirt, or debris at all times, *id.* at Vol. II p. 81;
- To select the location for, install, and maintain construction entrances and haul roads, *id.* at Vol. II p. 16-18, 20, 82-84, 94-95;
- To address any degradation and erosion control issues occurring at the construction entrances and haul roads, *id.* at Vol. II p. 14-18, 19-20, 80, 82-84, 94-95;

- To ensure that the Project's erosion control measures were appropriately installed and effective, *id.* at Vol. II p. 8-10, 88-92, 94-95; and
- To supervise and inspect any work related to erosion control measures performed by Roudebush, *id.* and *id.* at Vol. II p. 86-87, 101-02.

By deciding to perform this work, Walsh elected to assume a duty of care with respect to this work. Therefore, whether by virtue of assumption of a non-delegable duty of care or by assumption of a duty of care that was not delegated to a subcontractor, we find that Walsh had a duty to Smith as a matter of law.

## B. Breach and Causation

[26] Next, we must consider whether there are any genuine issues of material fact related to breach that render summary judgment improper. Breach and proximate cause are almost always questions of fact to be resolved by a factfinder. *Megenity*, 68 N.E.3d at 1083.

[27] Walsh directs our attention to evidence in the record establishing that there was no mud on the roadway at the time of the accident and that reasonable care was exercised in the prevention and/or mitigation of such a hazard. We acknowledge that evidence, but Walsh must likewise acknowledge evidence tending to establish the opposite. Among other things, the record contains the following evidence:

- Deputy Giancola attested that he observed mud spanning both lanes of SR-25 in the vicinity of the accident. The mud he observed was so thick that vehicles could have left tracks, but any tracks would have been covered back up by additional mud and rain.

- Deputy Giancola also attested that the construction entrance near the accident was a significant source of the mud in the roadway. He observed mud tracks from the construction area on the night of the accident and had also seen mud in that area on previous patrols.

- Deputy Giancola concluded that the mud he observed in the roadway and the surface conditions of the roadway contributed to cause the accident.

- Delphi Police Officer Richard Miller attested that he observed a "fair amount" of mud in the roadway at the scene of the accident. Estate Appellee's App. Vol. II p. 124. He also observed mud tracks in the roadway leading from the construction area after the accident.

- Indiana State Police Trooper Tyler Stinson attested that he observed hazardous road conditions, including dirt, mud, and gravel on the roadway, in the area of the accident. Trooper Stinson observed that one source of the mud and debris was washout from the construction area.

- Don Alderman, the tow truck driver who removed the wrecked vehicles from the scene, attested that he observed mud cascading down the roadway on the night of the accident. The mud obscured both the fog line and center line on the roadway. There was so much mud that it was running over his shoes, he was unable to remove it from the roadway, and it made the surface of the road slick. Alderman was familiar with that stretch of road and stated that it was virtually always covered in mud and debris from the construction area.

- Photographs of the scene show mud on the roadway on the night of the accident.

- Walsh's own designee attested that there was "absolutely" a problem with mud and sediment accumulating in the roadway in the vicinity of the accident. *Id.* at 93. Indeed, accumulations of mud and sediment in the roadway were so frequent that no effort was made to document instances in which they occurred.

- IDEM reports indicated that mud in the roadway at this location was a significant traffic concern to motorists on SR-25.

- The Estate's expert, Lori Cox, concluded that the mud observed in the photographs could not have accumulated in the approximately two hours between the time the last contractor left the job site and the time of the accident.

- Another expert concluded that wet mud caused or contributed to cause Smith to lose control of his vehicle.
- Multiple other witnesses attested that mud in the roadway in the vicinity of the accident had been an ongoing concern for weeks or months leading up to the accident.
- Walsh was required to maintain a twelve-inch layer of stone at the construction entrance. Part of the purpose of this stone was to provide erosion control and to prevent tracking of mud and soil onto the adjacent roadway. Evidence in the record tends to suggest that the construction entrance did not contain a twelve-inch layer of stone.
- There were no signs warning the traveling public of any mud or other hazard near the construction area on the night of the accident.

It is apparent that there are multiple genuine issues of material fact. We cannot say, based on this record, whether there was mud in the roadway at the time of the accident, whether the condition of the roadway was a cause of the accident, or whether Walsh's conduct in some way breached its duty of care. These questions must be resolved by a factfinder. Therefore, the trial court properly denied Walsh's summary judgment motion.[9]

# III. Remaining Defendants

[28] The Estate and Walsh both argue that the trial court erred by granting summary judgment in favor of IMI, Case, Roudebush, and RoadSafe. Walsh also argues that summary judgment should not have been entered in Lochmueller's favor.

---

[9] Walsh argues that the trial court inconsistently applied its findings regarding proximate cause between Walsh and the other defendants. As we find below that summary judgment was improperly granted in favor of the other defendants (except for RoadSafe), we will not reach this argument.

Walsh and the Estate contend that there are genuine issues of material fact with respect to each of these defendants rendering summary judgment inappropriate.

## A. Lochmueller

## 1. Waiver/Standing

[29] Walsh argues that the trial court should not have entered summary judgment in favor of Lochmueller. Walsh, however, did not object to Lochmueller's summary judgment motion (though it did object to the other defendants' motions), instead only filing a motion to correct error after the order was entered. Lochmueller argues that as a result, Walsh has waived the right to raise this issue on appeal and does not have standing to make the argument.

[30] As a general matter, "the dismissal of a co-defendant from a case subjects remaining defendants to greater potential liability," which creates "sufficient prejudice to confer standing upon a co-defendant to appeal such a ruling." *U-Haul Int'l, Inc. v. Nulls Machine & Mfg. Shop*, 736 N.E.2d 271, 280 (Ind. Ct. App. 2000). To preserve a claim of prejudice, however, "a defendant must articulate to the trial court any claim it would later assert upon appeal concerning the prejudicial effect of the dismissal of one of its co-defendants" and the "failure to do so waives the claim for purposes of appeal." *Id.*

[31] We find this Court's opinion in *Pier 1 Imports (U.S.), Inc. v. Acadia Merrillville Realty, L.P.*, to be instructive. 991 N.E.2d 965 (Ind. Ct. App. 2013). In *Pier 1*, the plaintiff sued three defendants (Pier 1, Acadia, and Boyd) following a slip and fall accident. All three defendants filed motions for summary judgment;

Pier 1 did not object to the summary judgment motions filed by Acadia and Boyd. The trial court granted summary judgment in favor of Acadia and Boyd but denied Pier 1's motion. Pier 1 filed a motion to correct error, arguing that summary judgment was improper, and the trial court denied the motion. Pier 1 then appealed the summary judgment orders in favor of Acadia and Boyd. This Court found that Pier 1 preserved its right to appeal when it filed the motion to correct error and that it was unnecessary for it to have objected to the motions for summary judgment to preserve its right to appeal. Our rationale for this ruling was that

> Pier 1 was not exposed as the 'remaining defendant' [for purposes of liability] until the trial court ruled on the [summary judgment] motions three months after oral argument . . . . Under these circumstances, we conclude that Pier 1 did not have a practical opportunity to object to Acadia's and Boyd's motions prior to the parties' dismissal. . . . We therefore conclude that Pier 1 has standing to appeal the grant of summary judgment in favor of Acadia and Boyd.
>
> Similar to the issue of standing, Acadia argues that Pier 1 waived its appellate challenge by not opposing Acadia's and Boyd's motions for summary judgment prior to [the] trial court's ruling thereon. Having concluded above that Pier 1 did not have an opportunity to object, we do not find that it has waived its claims for appellate review.

*Id.* at 969.

[32] Here, Lochmueller contends that unlike in *Pier 1*, Walsh had the opportunity to object. Indeed, Walsh did object to the summary judgment motions of all co-

defendants except for Lochmueller. But in *Pier 1*, Pier 1 also had the technical opportunity to object to its co-defendants' motions. What we meant by "practical opportunity to object" was merely that it was not until the trial court granted summary judgment in favor of some, but not all, defendants, that Pier 1 became the sole remaining defendant for purposes of liability apportionment. It was only at that time that it had the opportunity to object to the fact that it was the lone defendant standing. Here, likewise, it was not until Walsh was the lone defendant standing that it had the opportunity to object to that fact. When Walsh filed a motion to correct error following summary judgment, it preserved its right to appeal the order entered in favor of Lochmueller.

[33]     Lochmueller argues that even if Walsh retained the right to appeal the order, "it has standing only to vindicate its limited interest in asserting a nonparty defense as to Lochmueller, but it has no standing to resurrect a claim that the Plaintiff herself has elected not to pursue on appeal and thereby compel the plaintiff to litigate a dispute that she has chosen to let lie." Lochmueller Br. p. 11. It cites to no relevant authority in support of this proposition, however. And indeed, as noted above, defendants are entitled to appeal summary judgment orders entered in favor of co-defendants, even when the plaintiff does not appeal the orders. *E.g.*, *U-Haul*, 736 N.E.2d at 280; *Pier 1*, 991 N.E.2d at 968-69. So long as the defendant has a stake in the outcome, it has the right to appeal the order. Here, Walsh unquestionably has a stake in the outcome; consequently, its remedy on appeal is not limited as argued by Lochmueller.

# 2. Summary Judgment

The Estate alleged that Lochmueller was negligent by failing to incorporate appropriate erosion control measures into the plans it prepared for the Project. The standard of care for design professionals is well established:

> The responsibility of an architect is similar to that of a lawyer or physician. "When he possesses the requisite skill and knowledge, and in the exercise thereof has used his best judgment, he has done all the law requires." Thus, the key question in determining whether an architect has been negligent is not whether error occurred, but whether the architect breached a duty to exercise "the degree of competence ordinarily exercised in like circumstances by reputable members of the profession. . . ." Absent a special agreement, an architect does not imply or guarantee a perfect plan. Furthermore, an architect "is not a warrantor of his plans and specifications. The result may show a mistake or defect, although he may have exercised the reasonable skill required."

*Mayberry Cafe, Inc. v. Glenmark Const. Co.*, 879 N.E.2d 1162, 1173 (Ind. Ct. App. 2008) (internal citations omitted). Expert testimony is required when alleging a breach of this standard of care. *Troutwine Estates Dev. Co., LLC v. Comsub Design & Eng'g, Inc.*, 854 N.E.2d 890, 902 (Ind. Ct. App. 2006).

In support of its motion for summary judgment, Lochmueller designated evidence to show that it had complied with the standard of care in designing the Project plans. The Estate then designated evidence establishing the opposite. Specifically, the Estate designated the testimony of an expert, Lori Cox, who criticized Lochmueller's erosion control measures and maintenance of traffic

plan.[10]  Cox opined that a reasonable designer would have designed better erosion control measures to prevent hazardous conditions from forming on the roadway under normal and unexpected weather events.  Walsh App. Vol. V p. 222, 238-39.  Specifically, she concluded as follows:

1.      . . . [T]he failure of Lochmueller to consider runoff across the road along the super elevated portion of the curve and to not design proper soil erosion control measures to accommodate that, created hazardous conditions (mud and gravel on the pavement) under normal and expected weather events which led to this accident and the fatality of Mr. Smith on February 7, 2013.

2.      Specifically, the mud and gravel debris were the result of one or a combination of the following:  improper design and implementation of erosion control in the area of the super elevated curve, failure to remove construction deposits from the active roadway . . . , and failure to construct and maintain the temporary construction entrance/crossing all according to the permits, specifications and plans for the [P]roject . . . at the time of the event and in the area of the accident.

Walsh App. Vol. VI p. 28.

---

[10] The trial court found that the Estate had not preserved a negligence claim related to the maintenance of traffic claim.  We disagree, as Cox's deposition testimony identified multiple alleged issues related to Lochmueller's maintenance of traffic plan regarding signage that should have been used at or near the location of the accident.  Walsh App. Vol. V p. 226-27, 238-40.  Given this State's liberal notice pleading rules, the fact that this issue was identified prior to discovery closure and designated in response to Lochmueller's summary judgment motion was sufficient to preserve the claim and the issues of fact it raises on summary judgment.

[36] The trial court focused on the portion of Cox's testimony in which she concluded that the erosion control measures were "defective" but not "unreasonably defective." Walsh App. Vol. X p. 141. But there is no requirement in a professional negligence action that the end product or result be "unreasonably" defective. *See Walters v. Kellam & Foley*, 172 Ind. App. 207, 217, 360 N.E.2d 199, 206 (Ind. Ct. App. 1977) (holding that summary judgment was appropriate where plaintiff had failed to designate evidence that the design plans were "faulty or defective," adding no requirement that said plans were "unreasonably defective"). Instead, as with all negligence actions, the question is whether the defendant's conduct breached the relevant standard of care. By designating expert evidence that Lochmueller's erosion control measures were defective and that a reasonable designer would have included better erosion control measures in its plans, the Estate created a genuine issue of material fact as to whether Lochmueller breached its duty. Likewise, there are genuine issues of material fact as to whether, if Lochmueller breached its duty, any such breach was a proximate cause of Smith's accident. Under these circumstances, summary judgment in favor of Lochmueller should not have been entered. We reverse that judgment and remand for further proceedings.

# B. IMI

[37] Next, the Estate and Walsh each argue that summary judgment should not have been entered in favor of IMI.[11] As noted above, IMI was responsible for delivering concrete to the construction site. The record reveals that nine IMI ready-mix cement trucks made deliveries to the worksite the day before the accident occurred. Photographs of IMI's vehicles show that they are large, heavy, and prone to accumulating a significant amount of mud when traversing the muddy access and haul roads. Witnesses at the scene and one of the Estate's experts attested that much of the mud in the road appeared to have been tracked there by construction traffic.

## a. Contractual Duty

[38] The primary reason that the trial court granted summary judgment in favor of IMI was based on its conclusion that the subcontract did not apply to the deliveries that occurred the day before the accident. In other words, the trial court found that IMI had no contractual duty of any kind on that day.

[39] IMI executed two subcontracts—or purchase orders—that are relevant: one was executed with Walsh; the other was executed with Case. The following

---

[11] IMI argues that Walsh is collaterally estopped from making any arguments regarding IMI's duty. But the Estate also raises these arguments, meaning that we will address them whether or not Walsh is collaterally estopped from doing so.

evidence is relevant to the question of IMI's contractual duty on the day before the accident, when it made nine deliveries of concrete to the construction site:

- The Walsh subcontract states that the "scope of work" is to "supply concrete," and the "project name" identified the bridge worksite as the applicable location. Estate Appellant's App. Vol. III p. 225.
- Some of Walsh's interrogatories asked IMI to describe the work it performed, identify any contracts pertaining to this work, and describe the work IMI performed near the accident site within thirty days before the accident. IMI's response to all of these questions was to refer Walsh to the attached Walsh/IMI purchase order. Walsh App. Vol. IX p. 223, 226, 229.
- Some of Walsh's requests for production requested all contracts or agreements, conditions, specifications, purchase orders, and documents relating to the accident and any work performed by IMI for the Project. IMI's response was again to refer to the attached Walsh/IMI purchase order. *Id.* at 239-40, 242, 245-50.
- IMI also produced an invoice for one of its deliveries on the day before the accident that specifically references "IR 30846," which is the official Project name that is referenced in the Walsh/IMI purchase order. *Id.* at Vol. X p. 9.
- The IMI invoice and delivery tickets for the day before the accident reference the Project and "P.O. Number 775-1 & 800-1," which are the purchase order numbers on the two Case/IMI purchase orders. Walsh App. Vol. IX p. 139-53, 163-72.
- IMI designated an affidavit of one of its employees, who attested that IMI did not "perform any services" for or "deliver any materials to" Walsh under the Walsh/IMI purchase order on the day before the accident occurred. Joint Appellees' App. Vol. II p. 63.

As noted above, generally, duty is a question of law. But that is not always the case—at times, it may constitute a mixed question of law and fact. *E.g.*, *J.B. Hunt Transport, Inc. v. Guardianship of Zak*, 58 N.E.3d 956, 971 (Ind. Ct. App. 2016), *trans. denied*. We find that this is just such a case. A factual

determination must be made as to the contractual relationship between IMI and Walsh, and between IMI and Case, on the day before the accident occurred. We cannot answer that question with the record as it stands—there are material issues of fact that must be determined by a factfinder. Moreover, a factfinder must determine the scope of any contractual duty, whether IMI breached that duty, and whether any such breach was a proximate cause of the accident.

## b. Common Law Duty

Additionally, as the Estate notes, IMI owed a common law duty to exercise reasonable care in ensuring that its activities did not create a traffic hazard to motorists on SR-25. *Cf. Koroniotis v. LaPorte Transit, Inc.*, 397 N.E.2d 656, 659 (Ind. Ct. App. 1979) (noting that when a contractor is performing work at or near a public highway, it "has a duty to the traveling public to take proper precautions to protect it from a dangerous obstruction, created by his own acts, on that highway"). Whether IMI's conduct breached that duty, and whether any such breach was a proximate cause of Smith's accident, are questions of fact that must be determined by a factfinder.

The trial court's order suggests that IMI owed no duty because it was not reasonably foreseeable to IMI that any dirt it deposited might pose a hazard to motorists; this conclusion appears to be based on the trial court's finding that the roadway and Project area were cleared of mud and debris on a daily basis. There is a wealth of evidence in the record suggesting the opposite, however: the Estate designated testimony of multiple witnesses who said that the road

was seldom, if ever, cleared of mud, as well as an expert who concluded that the mud present shortly after the accident could not have accumulated in a single day, let alone a matter of hours. Consequently, there are issues of material fact regarding the frequency and effectiveness of any regular clearing of the roadway.

[42] The trial court also found, as a matter of law, that the road was clear of dirt, mud, and debris at the time of the accident. But as noted above, because there is evidence in the record to the contrary, this issue cannot be resolved as a matter of law. It must be determined by a factfinder. Consequently, summary judgment was improperly entered in favor of IMI and we reverse and remand.

# C. Case

[43] Walsh and the Estate each argue that summary judgment should not have been entered in favor of Case, the entity primarily responsible for the day-to-day construction at the worksite. Case does not dispute that it had a duty to prevent the tracking of mud onto the roadway, that it had a duty to clean any mud that it tracked, or that it had a duty to report any mud on the roadway (or any other unsafe condition) to Walsh. Instead, Case contends that the trial court properly determined as a matter of law that it did not breach any duty.

[44] Case admits that it had a duty to inspect SR-25 to ensure no hazards were present when it left the site and to inform Walsh if it observed mud on the roadway. Case designated evidence establishing that when its last employee left the site at 7:30 p.m., there was no mud or debris on the roadway. But we have

already found that there is a genuine issue of material fact regarding the presence of mud or other debris on the roadway at the time of the accident— and in the hours and/or days leading up to the accident.[12] It necessarily follows that there is a genuine issue of material fact as to whether Case, as the last contractor to leave the site on the day of the accident, breached its duties to inspect, clean, and inform Walsh of the situation.

[45] Moreover, there is evidence that the day before the accident, Case accepted numerous deliveries of cement and heavy equipment and that less than two hours before the accident, its employees and its subcontractor accessed and may have exited the worksite in nine separate vehicles via an allegedly muddy, inappropriately surfaced construction entrance. At the very least, this constitutes circumstantial evidence refuting Case's evidence that it was not responsible for the mud (if any) tracked onto the roadway. *See Richter v. Klink Trucking, Inc.*, 599 N.E.2d 223, 227 (Ind. Ct. App. 1992) (noting that negligence may be proved by direct or circumstantial evidence). Quite simply, these questions must be answered by a factfinder. Therefore, summary judgment should not have been granted in Case's favor, and we reverse and remand.

---

[12] Indeed, the day following the accident, a Case supervisor stated in a jobsite survey that "[t]his job has been seriously affected by the weather. (Freeze [and] thaw, mud and rain.)." Estate Appellant's App. Vol. IV p. 240.

# D. Roudebush

Next, Walsh and the Estate each contends that summary judgment should not have been granted in favor of Roudebush, which was the entity responsible for installing erosion control measures. Neither Walsh nor the Estate contends that Roudebush was negligent in the way it installed the erosion control measures. Instead, they argue that Roudebush should have done more than simply install those measures according to Lochmueller's plans. Specifically, they argue that there is a question of fact as to whether Roudebush should have insisted on the installation of silt fencing or other erosion control measures at the bridge construction site to prevent mud and debris from washing into the roadway at the location of the accident.

The subcontract between Walsh and Roudebush contains the following relevant provisions:

- Roudebush "assumes toward [Walsh] all of the obligations, risks and responsibilities that [Walsh] . . . has assumed toward [INDOT] and [Roudebush] is bound to [Walsh] by these obligations in the same manner as [Walsh] is bound to [INDOT]." Walsh App. Vol. XII p. 75.
- Roudebush had a duty to notify Walsh of any defects or variances in its own work or the work of any other entity on the Project surrounding, adjacent to, or underlying to its own work.[13]

_____

[13] As noted above, there is an issue of material fact as to whether Lochmueller's erosion control measures were defective.

- Roudebush had a duty to keep its worksite and any "public streets adjacent to the jobsite" clean. *Id.* at 92, 94-95. It was also required to immediately remove dirt from public roadways.[14]
- Roudebush was responsible for notifying Walsh of any unsafe site conditions if Roudebush did not have the resources or was not responsible for implementation of corrective action.

It is undisputed that Walsh selected the locations of and designed all haul roads and construction access roads after Lochmueller's plans and drawings had already been prepared and approved. Consequently, the Project's Special Provisions required a supplemental or amended erosion control plan to be prepared for "areas not included in the [INDOT] submittal as necessary for changes initiated by [Walsh]." Estate Appellant's App. Vol. IV p. 155. In other words, Roudebush was required to consider whether additional erosion control measures might be necessary because of the placement of construction entrances and roads where vehicles would enter or leave public roads:

> The installation of temporary erosion and sediment control measures shall include those necessary . . . [at] locations where Contractor's vehicles enter and leave public roads, and other locations where erosion or sediment control becomes an issue during the contract. . . .
>
> Adjustments of the erosion and sediment control measures shall be made where appropriate to meet field conditions. These

---

[14] It is essentially undisputed that on the days Roudebush employees were on-site, they did remove any mud, soil, and/or debris from the roadway with tractors with front end buckets, shovels, and brooms. It is likewise undisputed that Roudebush had not been on-site for over two weeks at the time of the accident.

measures shall be constructed as soon as practical and shall be maintained in accordance with [other contractual provisions].

*Id.* This provision is contained in the general INDOT contract, which was incorporated by reference into the Roudebush/Walsh subcontract.

[48] In light of these contractual provisions as a whole, it is apparent that Roudebush had a contractual duty to consider whether additional erosion control measures (in addition to those specified in Lochmueller's plans) were required by the placement of the construction entrance and haul road at the bridge construction site.[15] Roudebush appears to concede that it did not consider taking such action, as it insists that it was only required to install the erosion control measures specified in Lochmueller's original plans. What must be determined, therefore, is whether there is an issue of material fact as to whether additional erosion control measures should have been installed at or near the location of the accident.

[49] As noted above, the Estate's engineering expert, Cox, concluded that erosion control measures near the construction entrance were insufficient and defective and that additional measures, including silt fencing, should have been in place. *Id.* at 167, 181-219. The Estate also designated the testimony of several witnesses, who attested that washouts from the construction entrance and

---

[15] Roudebush spends a considerable amount of time in its brief arguing that it did not owe Smith a common law duty of care. But that is not the issue before us; instead, we are considering whether Roudebush owed a *contractual* duty that it may have breached.

nearby areas of the worksite were a significant source of mud observed on the roadway in the weeks leading up to the accident and on the night of the accident itself. Furthermore, an IDEM report from one week after the accident found the erosion control measures present in the vicinity of the bridge construction entrance to be unsatisfactory.[16] This evidence suffices to create an issue of material fact as to whether Roudebush's failure to consider additional erosion control measures was a breach of its contractual duties.

[50] The trial court also found causation lacking as a matter of law. But the Estate designated evidence that construction washout contributed to the hazardous road conditions on the night in question.[17] When combined with the above evidence that there were unsatisfactory erosion control measures in that vicinity, it is reasonable to infer that the failure to consider additional erosion control measures contributed to the mud and sediment that may have been on the roadway at the time of the accident. The Estate's causation expert testified that the wet mud on the surface of the roadway caused or contributed to cause Smith to lose control of his vehicle just before the collision. This evidence

---

[16] The trial court found as a matter of law that the ditch on the northern, super-elevated side of SR-25 obviated the need for any additional erosion control measures at that location. Cox, however, quite clearly testified that "ditches are not designed to act as erosion control" because they are merely meant to convey water, not divert mud and sediment. Estate Appellant's App. Vol. IV p. 159, 166-67. She also testified that this specific ditch, which was quite shallow, was insufficient to prevent mud or silt from overflowing onto the roadway, and there was evidence that it had, in fact, overflowed at some point in time before the accident. Given this evidence, it was erroneous to conclude as a matter of law that the presence of the ditch rendered other erosion control measures unnecessary.

[17] Roudebush claims that the evidence is undisputed that there was insufficient rainfall on the date of the accident to cause washout. But the Estate did, in fact, designate evidence to the contrary, tending to establish that there was mud on the roadway that stemmed partially from washout.

suffices to create an issue of material fact regarding whether Roudebush's breach (if any) was a proximate cause of the accident. Therefore, the trial court erred by granting summary judgment in favor of Roudebush, and we reverse and remand for further proceedings.

# E. RoadSafe

[51] Finally, the Estate and Walsh both argue that summary judgment should not have been granted in favor of RoadSafe, the entity primarily responsible for signage throughout the Project. The Estate alleged that RoadSafe was negligent for failing to provide warning signs regarding the mud on the roadway, failing to provide signage reducing the speed limit in advance of the construction zone, and failing to clean up the project site and roadway.

[52] It is undisputed that the design plans for the Project did not call for signage warning of mud or construction entrances to be installed, nor was RoadSafe ever directed to install such signage. As there were no requirements that it do so, we find as a matter of law that RoadSafe had no duty to install signage warning of mud or construction entrances.

[53] Signage regarding a reduced speed limit, however, is a closer question. It is undisputed that the Project's plans called for the installation of signage reducing the speed limit in the vicinity of the accident from fifty-five miles per hour to forty-five miles per hour during Phase I of construction, which was ongoing as of the date of the accident. Estate Appellant's App. Vol. III p. 175-79, 192-97. It is likewise undisputed that this signage was not installed as of that date. The

plans, however, did not specify *when*, during Phase I, the signage was required to be installed.  RoadSafe was required to perform its work in "strict compliance" with the plans, *id.* at 215, 218, 220, and any deviation from the plans required two precedential conditions:  (1) a specific determination by an INDOT engineer that deviation was warranted; and (2) a written authorization to deviate from the plans based on that determination.  *Id.* at Vol. IV p. 153.

[54]     It is also true, however, that RoadSafe was not permitted to place any signage until directed to do so by the engineer, Mike Stair of Parsons Brinckerhoff.[18] Stair attested that RoadSafe was not directed to install reduced speed signage at the outset of Phase I of construction.  He explained that the reason this deviation occurred was because between March 2012 and July 2013 (the accident occurred in February 2013), the construction did not impact the roadway itself.  Instead, the construction was off the roadway, at the site of the bridge work.  Consequently, Stair and INDOT determined that no reduction in speed limit was needed until the construction actually began to impact the roadway itself.

[55]     While the plans called for reduced speed limit signage to be installed during Phase I, they did not specify when the installation would take place.  Joint Appellees' Br. Vol. V p. 228, 232.  Phase I occurred over many months.  It was left to Stair and INDOT to decide when installation was appropriate; RoadSafe

---

[18] The Estate argues that Stair's affidavit should have been struck by the trial court, but we disagree.  It is based on his personal knowledge and otherwise satisfies Indiana Trial Rule 56(E).

waited for instructions before installing any signage. The fact that they determined that installation was not appropriate until later in Phase I is not a deviation from the plans, as the plans do not explicitly state that the signage was to be installed at the beginning of Phase I. Under these circumstances, we find as a matter of law that RoadSafe had no contractual duty to install reduced speed limit signage before directed to do so by Stair and/or INDOT.

[56] As for whether RoadSafe failed to clean up any mud its employees left in the roadway, there is no evidence in the record that at any occasion it failed to do so, nor did RoadSafe have any contractual obligations to clean up after *other* subcontractors at the worksite. RoadSafe employees had not been on-site for nine days before the accident, and when they were on-site, they did not go off-road. Given this record, we are comfortable saying as a matter of law that RoadSafe did not breach this duty. Therefore, the trial court properly granted summary judgment in favor of RoadSafe.

# Conclusion

[57] In sum, we affirm the denial of Walsh's summary judgment motion and the grant of RoadSafe's summary judgment motion. We reverse the grant of summary judgment in favor of Lochmueller, IMI, Case, and Roudebush. We also remand for further proceedings.

[58]     The judgment of the trial court is affirmed in part, reversed in part, and remanded for further proceedings.

Riley, J., and Brown, J., concur.