

**ATTORNEYS FOR APPELLANT**

Alexandra M. Curlin
Robin Clay
Indianapolis, Indiana

**ATTORNEY FOR APPELLEE**

Liberty L. Roberts
Church Church Hittle & Antrim
Noblesville, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Michael and Mary Poore,
Individually and on Behalf of
J.P.,

*Appellants-Defendants,*

v.

Indianapolis Public Schools and
its Board of Education,

*Appellees-Plaintiffs.*

September 9, 2020

Court of Appeals Case No.
19A-CT-1439

Appeal from the Marion Superior
Court

The Honorable James B. Osborn,
Judge

Trial Court Cause No.
49D14-1705-CT-18190

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellants/Cross-Appellees-Plaintiffs, Michael and Mary Poore, Individually and on behalf of J.P. (collectively, the Poores), appeal the trial court's judgment in favor of Appellee/Cross-Appellant-Defendant, Indianapolis Public schools and its Board of Education (IPS), on the Poores' claims for breach of contract, negligence, and violation of the Indiana Deceptive Consumer Sales Act when IPS refused to pay for J.P.'s advanced math class taken outside of the IPS system.

We affirm in part and reverse in part.

# ISSUES

The Poores present this court with four issues, which we restate as follows:

(1) Whether the trial court abused its discretion by excluding the testimony of a certain witness;

(2) Whether the trial court abused its discretion when it determined that IPS was not negligent because IPS did not deny J.P. the benefit of early college credits;

(3) Whether the trial court abused its discretion by concluding that IPS did not violate the Deceptive Consumer Sales Act (DCSA); and

(4) Whether the trial court abused its discretion by concluding that no breach of contract occurred where IPS provided three options for J.P.'s advanced math class but the parties failed to have a valid, enforceable contract requiring IPS to pay for J.P.'s math class at a local university.

[4] On Cross-Appeal, IPS presents this court with one issue, which we restate as: Whether the trial court erred in determining that IPS, a common school corporation, is a supplier engaged in consumer transactions within the meaning of the DCSA.

# FACTS AND PROCEDURAL HISTORY

[5] By the time J.P. attended kindergarten, IPS informed his parents that their son was "way ahead of everybody else." (Transcript Vol. III, p. 48). He was identified as a gifted student and invited to attend Merle Sidener, the gifted and talented academy at IPS. J.P. attended Merle Sidener from fifth grade through eighth grade and took Algebra I, Geometry, Algebra II, and Pre-Calculus. In late 2014, when J.P. was in eighth grade, the Poores considered J.P.'s possibilities for high school. The Poores anticipated that the only way to accommodate J.P.'s math talents would be to choose "a high school that could offer [college level math courses] … as part of their curriculum." (Tr. Vol. III, p. 56). At the time the Poores commenced exploring high school options, IPS announced its intent to redesign its Magnet & Choice programs. As part of the redesign, the International Baccalaureate (IB) program moved from the Gambold Preparatory Magnet High School to Shortridge High School (Shortridge), and the Law and Public Policy magnet program was relocated from Shortridge to Arsenal Technical High School.

[6] While attending a school fair in November 2014, the Poores received a brochure for Shortridge that listed the "Butler Early College Program Experience," which allowed qualified juniors and seniors to earn up to twelve

college credits at Butler University. (Exh. Vol. I, Exh. 42). In December 2014, the Poores attended a question and answer session at Gambold Preparatory Magnet High School, where Shane O'Day (O'Day), Gambold's principal, provided information about the IB program's impending move to Shortridge. At the conclusion of the program, the Poores spoke with O'Day about possible math offerings for J.P. That same month, and prior to the magnet school application deadline, the Poores decided to enroll J.P. in the IB program, housed at Shortridge.

[7] On March 19, 2015, while J.P. was completing his eight grade at Merle Sidener, the Poores sent O'Day an email, explaining that J.P. would be attending the IB program at Shortridge the following school year but also voicing some concerns about J.P.'s readiness for Calculus based on the Pre-Calculus class that J.P. was taking at Broad Ripple High School. On March 22, 2015, O'Day responded to the Poores' email, advising that "[i]f it is determined that [J.P.] is prepared for [C]alculus, we can work with Butler University, look at an online calculus class (with a teacher for support), or another calculus option." (Exh. Vol. I, Exh. 44, p. 133).

[8] Sometime between July 1, 2015 and October 2015, O'Day, who had transferred to Shortridge, created the website for the IB program at Shortridge. The website explained that "[Shortridge] serves as Butler University College of Education's Middle Secondary Laboratory School" and that this "partnership is designed to serve as a professional development site for pre-service candidates who are training to become teachers as well as provde a collaborative research

facility for both Shortridge and Butler faculty." (Exh Vol. I, Exh. 20). The website also indicated that one of the "Butler benefits for students while at Shortridge" included "Early College opportunities – access to taking classes at Butler, for credit, if academically eligible;" and that one of the "future benefits at Butler for Shortridge students" was the "[a]bility to apply for one of the ten 'Tuition Guarantees' available to IPS students through Butler" should the IPS student elect to continue his or her education at Butler after graduating from IPS. (Exh. Vol. I, Exh. 20). "The tuition guarantees provide full tuition coverage when combined with available state/federal financial aid." (Exh. Vol. I, Exh. 20).

[9] In June 2015, J.P. met with John Riley (Riley), an IPS math teacher, and obtained the study guide for the Pre-Calculus class. After working through the study guide, the Poores determined that it would be better that J.P. re-took Pre-Calculus during his freshman year at Shortridge. At the end of J.P.'s freshman year, no math class was included in his sophomore schedule and the IB program at Shortridge did not have a Calculus class available. Therefore, during the summer between J.P.'s freshman and sophomore years, IPS and the Poores explored the possibility of J.P. taking a math class at Butler University during J.P.'s sophomore year.

[10] On July 19, 2016, O'Day emailed Associate Professor Shelley Furuness (Professor Furuness) at Butler University to explore the option for J.P. to attend an advanced math class. Between July 19, 2016 and September 7, 2016, IPS and Butler exchanged several emails to place J.P. in an appropriate class,

ensured J.P. took a placement exam, and determined the process to enroll him into a Calculus class at Butler for his sophomore year. Butler directed IPS to have J.P. apply through the Gifted and Talented program. By the time J.P.'s application materials were completed, Butler's classes had started and J.P. had missed too many classes to be able to catch up. Ultimately, IPS enrolled J.P. in a Calculus class through the Indiana Online Academy for the Fall semester of his sophomore year, with in-person support by IPS teachers.

[11] The cost of the Butler course was first raised on September 1, 2016 by the Associate Director of Admissions at Butler University. There had been no discussion about any costs associated with a class at Butler until the online class became the only viable option to provide J.P. with math instruction during the first semester of his sophomore year. During the spring semester of J.P.'s sophomore year, the Poores insisted that he be enrolled in a college math class. IPS advised that J.P. could be enrolled in a math course at Butler for the Spring semester of his sophomore year but that IPS would not pay for the course. When the Poores requested to enroll J.P. in a math course at IUPUI instead, IPS again confirmed that it would not pay for the class. Instead, IPS enrolled J.P. in an AP Calculus class at Arsenal Technical High School for the Spring semester of the sophomore year. The Poores declined this option and enrolled J.P. in the IUPUI math class, paying $1,456.14 for the course. At the time of graduation, J.P. was on track to graduate with the Core 40 Diploma with Academic Honors and would be taking the IB exams.

[12]     On May 7, 2017, the Poores filed their Complaint against IPS sounding in negligence, breach of contract, and deceptive practices. On September 18, 2018, IPS filed a motion for summary judgment, to which the Poores responded. On November 14, 2018, the trial court denied summary judgment to IPS. On November 28-29, 2018 and March 20, 2019, the trial court conducted a bench trial and received testimony. On May 28, 2019, the trial court ruled in favor of IPS on all claims, concluding, in pertinent part,

> 2. The Poores have failed to prove that a contract existed between them and IPS which required IPS to provide J.P. with a class at Butler free of charge. The evidence shows the Poores and IPS did not have an agreement or meeting of the minds relating to payment for a college course at Butler. The evidence shows that the parties never discussed payment for a college course until they discussed the on-line course in September 2016, after the Butler course was no longer an option for first semester. There is no evidence of a meeting of the minds between the Poores and IPS on all essential elements or terms of the agreement. Without a meeting of the minds on the issue of payment for the Butler math course, there can be no valid enforceable contract.
>
> 3. IPS did not promise J.P. a class at Butler. Rather, it provided three options for J.P. to take a calculus class. Providing three options for achieving a goal does not provide an agreement that is reasonably definite and certain to create a valid and enforceable contract.
>
> * * * *
>
> 6. IPS fulfilled its duty to provide J.P. with classes necessary for him to graduate with a Core 40 Diploma with Academic Honors. Indiana Department of Education requirements (relating to

math) for a Core 40 Diploma with Academic Honors requires a student to have a total of 8 credits with the minimum requirements of: 2 credits in Algebra I, 2 credits in Geometry, 2 credits in Algebra II, and an "additional Core 40 math credit." Prior to enrolling at Shortridge, J.P. had already obtained 2 credits in Algebra I, 2 credits in Geometry, and 2 credits in Algebra II. To satisfy the requirements for a Core 40 Diploma with Academic Honors, J.P. only needed to obtain 2 additional math credits during his four years at Shortridge and take at least one semester of math or quantitative reasoning during each of his four years at Shortridge. The evidence shows that IPS provided J.P. with a math class every year he has been at Shortridge. The semester that J.P. took a class at IUPUI, IPS had enrolled J.P. in a Calculus class, but the Poores opted to enroll J.P. in the IUPUI class instead. The evidence shows that the Poores rejected the class that was provided by IPS, not that IPS failed to provide a class.

* * * *

10. IPS is a "supplier" as that term is defined in the Deceptive Consumer Sales Act. IPS regularly engages in consumer transactions through its disposition of education services. IPS engages in public outreach, including open houses, to encourage students to choose IPS schools over other options. An IPS school financially benefits when a student chooses an IPS school because tax dollars are distributed to the school based on enrollment figures.

11. The Poores, however, have failed to prove that IPS and its representatives committed an unfair, abusive, or deceptive act, omission or practice when presenting options to the Poores. The Poores drew the wrong conclusions from accurate information presented to them.

(Appellants' App. Vol. II, pp. 19-22).

The Poores now appeal. Additional facts will be provided if necessary.

# DISCUSSION AND DECISION

## I. *Admission of Evidence*

The Poores first contend that the trial court abused its discretion by refusing to admit the testimony of Kurt Thomas (Thomas) because he had no personal knowledge of the communications between the Poores and IPS. The standard of review for admissibility of evidence is abuse of discretion. *Weinberger v. Boyer*, 956 N.E.2d 1095, 1105 (Ind. Ct. App. 2011). The trial court abuses its discretion only when its action is clearly erroneous and against the logic and effect of the facts and circumstances. *Id*. Even when the trial court erred in its ruling on the admissibility of evidence, this court will reverse only if the error is inconsistent with substantial justice. *Id*.

The Poores attempted to admit Thomas' testimony about his own personal understanding as he was told the "same things" the Poores were told by O'Day and went through a "very similar experience." (Tr. Vol. II, pp. 160-61). In their offer of proof, the Poores advised the trial court that Thomas' son was a year younger than J.P. and similarly advanced in math. Thomas would have testified about his conversation with O'Day concerning the math course offerings at Shortridge and confirmed that O'Day advised him that his son could enroll at Butler through the Shortridge-Butler partnership. Thomas would have informed the trial court that O'Day advised him that dual credit

courses would be available without charge to students. Thomas would have testified that IPS led him to believe the Butler program was integrated into the Shortridge curriculum and that his son would have received dual credit coursework through Shortridge as a result of the partnership with Butler. IPS objected to the offered testimony—and the trial court sustained the objection—based on relevancy and because there was no class action or other claim requiring the establishment of a "pattern or practice." (Tr. Vol. II, p. 161).

[16] Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evidence Rule 401. "Although evidence must be relevant to be admissible, not all relevant evidence is admissible." *Terex-Telelect, Inc. v. Wade*, 59 N.E.3d 298, 303 (Ind. Ct. App. 2016), *trans. denied*. Indiana Evidence Rule 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, considerations of undue delay, or needless presentation of cumulative evidence. *Id.*

[17] In support of their argument that Thomas' testimony is relevant, the Poores refer this court to *Grand R & I.R. Co. v. Diller*, 9 N.E. 710 (Ind. 1887), where Diller incurred injuries due to a collision. One of the essential facts to be established was that the engineer neglected to signal the pending arrival of the train at the highway crossing as required by statute. *Id.* at 710. At trial, the appellee produced a witness who had overheard a conversation with the

engineer of the train, admitting that he had not provided the signal. *Id*. Our supreme court held that the overheard conversation was admissible as it was "in the nature of an admission." *Id*.

[18] We find *Diller* inapposite to the case at hand. Unlike *Diller*, the evidence reflects that Thomas was not present during or overheard any conversations between the Poores and IPS, nor was he copied on any email exchange between the parties. Although the evidence offered by Thomas would have pointed to a similar personal experience of his son with IPS one year after J.P.'s experience, such testimony was not relevant as it did not "go to the heart of the matter with regard to any of the three claims" brought by the Poores. (Tr. Vol. II, p. 164). Thomas' offered testimony would only reflect what O'Day told him with regards to his son, it would not reflect on the Poores' conversations with O'Day or their experience within the IPS system. Accordingly, as Thomas' statements would not make the Poores' claims more or less probable, his testimony was not relevant and was properly excluded by the trial court. *See* Evid. R. 401.

## II. *Negligence*

[19] The Poores challenge the trial court's determination that IPS was not negligent because IPS provided the necessary classes for J.P. to graduate with a Core 40 Diploma with Academic Honors. While they concede that "of course" J.P. could "obtain a Core 40 Diploma with [H]onors," they now maintain that "[t]he main issue is whether he was negligently denied college credit that would

have given him college level coursework and allowed him to 'achieve postsecondary competencies.'"[1]  (Appellants' Br. pp. 20-21).

[20]  To prevail on a negligence claim, the plaintiff must show (1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty by allowing conduct to fall below the applicable standard of care; and (3) compensable injury proximately caused by the breach of duty.  *Smith v. Walsh Contr. Co. II, LLC*, 95 N.E.3d 78, 84 (Ind. Ct. App. 2018).  The element of duty is generally a question of law to be determined by the court.  *Id*.  The elements of breach and proximate cause, however, generally present questions of fact that must be determined by a factfinder.  *Id.*

[21]  As the Poores have admitted on appeal that IPS fulfilled its duty to supply the necessary classes for J.P. to graduate with a Core 40 Diploma with Academic Honors, we will only address whether IPS had a duty to provide J.P. with college level or dual credit coursework.  Pursuant to Indiana Code section 20-30-10-4, "[e]ach high school must provide at least two (2) of each of the following course offerings:  (1) Dual credit, (2) Advanced placement.  A dual credit course is statutorily defined as "a course taught by a high school faculty

---

[1] In their appellate Brief, IPS argues that the Poores' negligence claim submitted to the trial court focused on IPS's alleged failure to provide J.P. with the necessary classes to graduate with a Core 40 Diploma with Academic Honors.  IPS contends that the Poores' appellate claim, which is based on IPS's failure to provide college level coursework, is a new theory not pursued in the Complaint or before the trial court.  However, as neither party included the Complaint in the Appendix, we cannot review IPS's argument.  *See* Ind. Appellate Rule 49 & 50(A)(2)(f).

member, a college faculty member, or a college adjunct faculty member that a high school student may take to earn both high school and college credits."

[22]     O'Day testified that to fulfill the statutory requirement of a dual credit offering, Shortridge had entered into a dual credit agreement with a particular university through the IB program. Upon successful completion of the IB course, the student would receive a dual credit which includes a credit at the student's high school as well as a college credit for the course. O'Day explained the advantage of the IB program as follows:

> If we go back to the traditional model of a particular high school with a particular single university as the dual credit accrediting agency that is the only credit and university transcript for that particular course So, to put it into real terms, of the times here with IPS, and use perhaps the IUPUI SPAN Program as an example, when a child completes a dual credit class, they'll receive an IUPUI transcript that indicates that credit. What the advantage we have as a school and as an IB school is it is the receiving university of the child that will award a credit. [] The advantage of the IB program is if your child is admitted into Northwestern University then they award that credit to the child for completion of the IB course. So what it does, it prevents having multiple transcripts and it allows where the child ultimately enrolls for that crediting institution, the university, to then provide that college credit.
>
> * * * *
>
> So, it is even located on our website – so the [IB] Organization places together on an Excel spreadsheet all of the different university requirements for them in regards to receiving that credit.

(Tr. Vol. II, pp. 171-73). Students can earn these dual credit courses for free based on their IB classes at Shortridge and their performance on the IB finals.

[23] Focusing on Shortridge's partnership with Butler, the Poores claim that J.P. should have been allowed to take dual credit classes at Butler free of charge. However, the partnership between the two schools relied mainly on a collaborative relationship between faculty, and while the Shortridge website indicated that one of the "Butler benefits for students while at Shortridge" included "Early College opportunities – access to taking classes at Butler, for credit, if academically eligible," O'Day testified that this opportunity was only available to juniors and seniors and was being phased out when O'Day introduced the IB program at Shortridge. (Exh. Vol. I, Exh. 20). Accordingly, dual credit classes were offered through the IB program.

[24] The statutory provision on dual credit requirements does not grant a student the right to attend the university or college of its choice with the high school required to pay the cost, nor does it include the opportunity for a student to shop around for a college class of his or her choice. Instead, the statute places the burden on the high school to make dual credit classes available to its students, which IPS satisfied through the IB program. Thus, based on the evidence before us, we concur with the trial court that IPS complied with its duty to provide J.P. with dual credit classes and therefore cannot be held to be negligent.

### III. *The Indiana Deceptive Consumer Sales Act*

[25] Characterizing IPS as a supplier under the DCSA, the trial court concluded that IPS had not deceived the Poores when presenting them with several options to fulfill J.P.'s math requirement. The Poores now challenge this conclusion by maintaining that IPS, a supplier of education services, engaged in an incurable deceptive act, as defined under the statute, by deceiving the Poores into believing that J.P. could take Calculus classes at Butler for college credit free of charge. Related to this argument is IPS's cross-appeal contending that, while the trial court's ultimate conclusion is correct, the court nevertheless erred by characterizing IPS as a supplier of education services pursuant to the DCSA. As IPS's cross-appeal presents us with a threshold issue, we will first address its argument.

[26] The interpretation of a statute is a question of law, which is reserved for the courts. *Koehlinger v. State Lottery Comm'n of Indiana*, 933 N.E.2d 534, 541 (Ind. Ct. App. 2010). When interpreting a statute, we follow several rules of statutory construction. *Id*. First, we do not interpret a statute that is facially clear and unambiguous. *Id*. Rather, we give the statute its plain and clear meaning. *Id*. Second, if a statute is ambiguous, we seek to ascertain and give effect to the legislature's intent. *Id*. In so doing, we read a statute as a whole and strive to give effect to all of the provisions. *Id*. Indeed, when construing a statute, all sections of an act are viewed together. *Id.* Additionally, we will avoid an interpretation that renders any part of the statute meaningless or superfluous. *Id*.

[27]    The DCSA is to be "liberally construed and applied to promote its purposes and policies[, which] are to: (1) simplify, clarify, and modernize the law governing deceptive and unconscionable consumer sales practices; (2) protect consumers from suppliers who commit deceptive and unconscionable sales acts; and (3) encourage the development of fair consumer sales practices." I.C. § 24-5-0.5-1. To that end, the DCSA entitles a person relying upon one of the several enumerated deceptive acts to recover "damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater." I.C. § 24-5-0.5-4. The DCSA does not apply, however, to "an act or practice that is . . . required or expressly permitted by state law, rule, regulation, or local ordinance." I.C. § 24-5-0.5-6(2).

[28]    IPS is "a common school corporation" that provides education services to students within its district. I.C. § 20-25-1-1. In carrying out this purpose, the student's school counselor, "after seeking consultation with each student's parents" shall further develop a graduation plan to include the subject and skills areas of interest to the student. I.C. § 20-30-4-2(1). They will also develop "[a] program of study under the college/technology preparation curriculum" that "meets the interests, aptitude, and postsecondary goals of the student," as well as incorporate "[a]ssurances that, upon satisfactory fulfillment of the plan, the student: (A) is entitled to graduate[.]" I.C. § 20-30-4-2(3) & -(4).

[29]    The record undeniably reflects that J.P. showed a high aptitude for math. To develop and support his aptitude, IPS offered to "work with Butler University, look at an online calculus class (with a teacher for support), or another calculus

option." (Exh. Vol. I, Exh. 44, p. 133). The Butler class was presented as one of three options, without any guarantee as to which option would ultimately be provided to J.P. Although the application materials for Butler were not timely submitted for J.P. to enroll in the advanced math class and J.P. had missed too many classes to be able to catch up, IPS enrolled J.P. in a Calculus class through the Indiana Online Academy for the Fall semester of his sophomore year, with in-person support provided by IPS teachers. As a result, J.P. was able to graduate with classes necessary to receive a Core 40 Diploma with Academic Honors. As IPS's action of providing these specific educational opportunities tailored to J.P.'s abilities are expressly permitted by the statute, the DCSA does not apply.[2] *See* I.C. § 24-5-0.5-6(2). As such, we reverse the trial court's conclusion that IPS was subject to the requirements of the DCSA.[3]

## IV. *Breach of Contract*

[30] As a final contention, the Poores argue that the trial court abused its discretion by determining that no enforceable contract existed between IPS and the Poores

---

[2] In their reply brief, the Poores refer to I.C. § 24-5-0.5-3(b), which enumerate "thirty-seven instances of statutorily allowed transactions that are nonetheless subject to the DCSA protections." (Cross-Appellees Br. p. 15). However this list includes acts which have been deemed by the legislature to constitute *per se* acts of deception under the DCSA.. *See* I.C. § 24-5-0.5-3(b) ("the following acts, and the following representations as to the subject matter of a consumer transaction, made orally, in writing, or by electronic communication, by a supplier, are deceptive acts . . .). Unlike the Poores' statement, these are not "statutorily allowed transactions" that nonetheless fall under the DCSA. Instead, it represents a list of acts compiled by the legislature that wiare deemed deceptive without otherwise limiting the definition of deceptive act. Furthermore, while the list does not limit the scope of deceptive acts under the DCSA, no acts listed pertain to the provision of education services.

[3] As we conclude that the DCSA is not applicable to IPS, we will not address the Poores' argument that IPS committed an incurable deceptive act, as defined by the statute.

as there was no meeting of the minds about the payment for a college course at Butler.

[31]     The existence of a contract is a question of law. *Mueller v. Karns*, 873 N.E.2d 652, 657 (Ind. Ct. App. 2007). It is up to the court to decide, as a question of law, whether a contract existed. *Am. Family Mut. Ins. Co. v. Matusiak*, 878 N.E.2d 529, 533 (Ind. Ct. App. 2007). However, "where the existence . . . of a contract or the terms thereof is the point in issue, and the evidence is conflicting or admits of more than one inference, it is for the [trier of fact] to determine whether a contract in fact exists." *Barker v. Price*, 48 N.E.3d 367, 371 (Ind. Ct. App. 2015).

[32]     It is well-understood that "[c]ontracts are formed when parties exchange an offer and acceptance." *Fox Dev., Inc. v. England*, 837 N.E.2d 161, 165 (Ind. Ct. App. 2005), *trans. denied*. A meeting of the minds of the contracting parties, having the same intent, is essential to the formation of a contract. *Id*. Accordingly, the basic requirements for a contract are offer, acceptance, consideration, and a meeting of the minds between the contracting parties on all essential elements or terms of the transaction. *Morris v. Crain*, 969 N.E.2d 119, 123 (Ind. Ct. App. 2012). In addition, to be valid and enforceable, a contract must be reasonably definite and certain. *Allen v. Clarian Health Partners, Inc.*, 980 N.E.2d 306, 309 (Ind. 2012). Only "reasonable" certainty is necessary, "absolute certainty in all terms is not required." *Id*. at 310.

[33] While there is no written agreement signed by the parties, the validity of a contract is not dependent upon the signature of the parties, unless such is made a condition of the agreement, which was not the case here. *State v. Daily Express, Inc*. 465 N.E.2d 764, 767 (Ind. Ct. App. 1984). However, some form of assent to the terms is necessary and may be expressed by acts which manifest acceptance. *Id*.

[34] On March 19, 2015, while J.P. was completing his eighth grade at Merle Sidener, the Poores commenced communication with O'Day by email, signaling their intent that J.P. would be attending the IB program at Shortridge the following school year and inquiring about math classes based on J.P.'s aptitude. On March 22, 2015, O'Day responded to the Poores' email, advising that "[i]f it is determined that [J.P.] is prepared for calculus, we can work with Butler University, look at an online calculus class (with a teacher for support), or another calculus option." (Exh. Vol. I, Exh. 44, p. 133). Without granting a right to enroll at classes at Butler, IPS's website explained that one of the "Butler benefits for students while at Shortridge" included "Early College opportunities – access to taking classes at Butler, for credit, if academically eligible." (Exh. Vol. I, Exh. 20). Over the next several months the Poores engaged in numerous communications with O'Day, expressing their preference for the Butler course out of the three options provided by O'Day, and inquiring about how this course would meet J.P.'s needs. The evidence reflects that IPS worked with Butler to find a course suitable for J.P.'s needs, but due to time constraints, J.P. was unable to timely enroll in the Butler course. Although the

parties conversed in detail about the registration and academic rigors of the Butler course, at no point during these conversations did the parties broach the subject of payment for it. It was only after J.P. was enrolled in the online math class, after the Butler class was no longer an option, did the parties discuss payment for the college level class.

[35] The Poores now attempt to infer a meeting of the minds on payment from O'Day's statement that IPS would provide transportation to Butler. By stating that IPS would provide transportation, the Poores maintain that IPS "confirmed that it would pay for the course, otherwise, what benefit would IPS be offering." (Appellants' Br. p. 34). In support of their argument, the Poores rely on *Nationwide Ins. Co. v. Heck*, 873 N.E.2d 190 (Ind. Ct. App. 2007). In *Nationwide*, a passenger in a vehicle incurred injuries due to a vehicular accident. *Id.* at 192. Early on in the dispute, an oral agreement was reached between the passenger and Nationwide that Nationwide would not deny coverage and would reimburse all incurred damages. *Id.* This agreement was memorialized in a writing. *Id.* Over the next twenty-eight months, the insurance adjuster requested the medical bills, medical records, inquired about the passenger's recovery, and entered into negotiations to settle the claim. *Id.* at 194-95. "At no time did [Nationwide] state or imply that coverage was an issue." *Id.* at 194. Twenty-eight months later, Nationwide denied coverage. *Id.* at 195. Focusing on the premise that assent to the terms "may be expressed by acts which manifest acceptance," the court concluded that the conduct of Nationwide's insurance adjuster demonstrated that an agreement existed on

liability and jurisdiction, with the only remaining issue being the amount of damages. *Id*. at 196-97.

[36] We find *Nationwide* inapposite to the facts before us. Unlike *Nationwide* where an agreement existed on all essential terms, including the term which was later disputed by Nationwide, IPS and the Poores never discussed the payment of the Butler class, let alone reached an agreement that was later revoked by one of the parties. Although there might have been an agreement about transportation, it cannot be inferred from words or action—as the Poores would encourage us to do—that transportation also included payment.

[37] As the parties never reached an agreement on paying for the college class, there was no reasonably definite and certain payment term so as to create a valid and enforceable contract. "[W]here any essential term is omitted from a contract, or is left obscure or undefined, so as to leave the intention of the parties uncertain as to any substantial term of the contract, the contract may not be specifically enforced." *Conwell v. Gray Loon Outdoor Mkg. Grp., Inc.*, 906 N.E.2d 805, 813 (Ind. 2009). Therefore, we affirm the trial court's conclusion that no contract existed between IPS and the Poores which required IPS to provide J.P. with a class at Butler free of charge.

## CONCLUSION

[38] Based on the foregoing, we hold that the trial court did not abuse its discretion by excluding the testimony of a certain witness; IPS was not negligent because IPS did not deny J.P. the benefit of early college credits; and no valid,

enforceable contract existed between IPS and the Poores, requiring IPS to pay for J.P.'s math class at Butler University. We reverse the trial court's conclusion on the DCSA and hold that IPS was not subject to the statutory requirements of the DCSA.

[39] Affirmed in part and reversed in part.

May, J. and Altice, J. concur